957 F.2d 845
 Josephine HARDIN, individually and as administratrix of the
Estate of Edie L. Houseal, Deceased, Plaintiff-Appellee,
v.
James HAYES, Sheriff of Etowah County; John Raley; John
Morris, Defendants-Appellants,
Marion T. Smith; Billy Ray McKee, Commissioner of Etowah
County; Jesse F. Burns, Commissioner of Etowah County;
W.A. Lutes, Commissioner of Etowah County; Lawrence
Presley; Billy Ray Williams; City of Gadsden, a Municipal
Corporation, Defendants.
 No. 90-7818.
 United States Court of Appeals,
Eleventh Circuit.
 April 9, 1992.
 
 Julius F. Parker, Jennifer Parker LaVia, Parker, Skelding, Labasky & Corry, Tallahassee, Fla., Roger W. Kirby, City Atty., Gadsden, Ala., for Morris.
 Don G. DeCoudres, Birmingham, Ala., for Hayes & Raley.
 Robert M. Shipman, Earl D. McNeal, Huntsville, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before ANDERSON and DUBINA, Circuit Judges and ESCHBACH*, Senior Circuit Judge.
 DUBINA, Circuit Judge:
 
 
 1
 The appellants in this case appeal the district court's order denying their motions for summary judgment based upon the doctrine of qualified immunity. This action was brought under 42 U.S.C. § 1983[1] by Josephine Hardin ("Hardin"), the personal representative of the estate of Edie L. Houseal (the "Decedent"), an Alabama prison inmate who died while incarcerated. Hardin alleges the appellants' deliberate indifference to the Decedent's psychological well-being, in violation of the Eighth Amendment to the United States Constitution.[2] Hardin also alleges a pendant state wrongful death claim. The district court denied the appellants' motions for summary judgment. We reverse.
 
 I. STATEMENT OF THE CASE
 A. Background Facts
 
 2
 The Decedent was arrested on May 29, 1989, in Gadsden, Alabama, (the "City") by City police, after calling the police and claiming that her life was in danger. The Decedent was charged with public intoxication, disorderly conduct and resisting arrest. On the way to the City jail, the Decedent kicked and dented the right, rear door of the police car. Upon her arrival at the jail, the Decedent tried to escape by running away. Officers recaptured her after a short scuffle in which she received a small cut above her right eye. Officers took the Decedent, partially disrobed, into the jail's booking area. Because the Decedent was disruptive, she was taken immediately to a jail cell. Paramedics were called. When they arrived, the Decedent refused treatment. The paramedics examined her visually from outside the cell, found her injury to be minor, and left without entering the cell.
 
 
 3
 Due to remodeling work at the City jail, certain prisoners--including the Decedent--were sent to the Etowah County (the "County") jail during the daytime and returned to the City jail at night.
 
 
 4
 On May 30, the Decedent was taken to the County jail where she beat her forehead against the bars of her cell. When jail officials came to assist, the Decedent grabbed a ballpoint pen from a jail matron's pocket and stabbed the matron in the hand. She then stabbed herself in the neck with the pen. Paramedics were again summoned, and the Decedent was taken to Baptist Memorial Hospital for treatment of her forehead and neck injuries.[3] Thereafter, City police officers returned the Decedent to the City jail for the evening.
 
 
 5
 The next morning, May 31, the Decedent was taken to the County jail. No incidents were reported. However, when City police officers arrived to return the Decedent to the City jail, she resisted, and had to be restrained with handcuffs and leg irons.
 
 
 6
 On June 1, the Decedent was again taken to the County jail where, at the request of City officials, social worker William E. Owens ("Owens") of the Cherokee/Etowah/DeKalb Mental Health Center interviewed the Decedent in her cell. The Decedent refused to answer any questions, except to say "No" when asked if she had ever been in a mental hospital. The Decedent also said "No" when asked if she would agree to commit herself voluntarily to a mental hospital. Owens then left to begin the paperwork necessary for involuntary commitment.
 
 
 7
 Later that morning, the Decedent flooded her cell by running water into a stopped-up sink. The water to her cell was cut off. At about 10:00 a.m., County Sheriff James Hayes ("Sheriff Hayes") and County Chief Correctional Officer John Raley ("Chief Raley") observed the Decedent pacing amid a quarter inch of standing water in her cell. Excrement lay on the floor. Sheriff Hayes ordered Chief Raley to call the City and tell its officers to remove the Decedent from the County jail; Chief Raley made the call. However, shortly before City officers and fire medics arrived, the Decedent collapsed in her cell. When reached by the fire medics, she was unconscious. Despite attempts at cardiopulmonary resuscitation and other medical procedures, the fire medics could not establish an airway. The Decedent was pronounced dead at the hospital within one hour.
 
 
 8
 An autopsy determined the cause of death to be asphyxia due to a small bar of soap lodged in the Decedent's hypopharynx. A bar of soap was also found in the Decedent's stomach. The Alabama State Medical Examiner concluded that the Decedent's death was accidental.
 
 B. Procedural History
 
 9
 Hardin sued City and County officials in their official and individual capacities under 42 U.S.C. § 1983, alleging deliberate indifference to the Decedent's mental needs in violation of the Eighth Amendment. The defendants included the City, Police Chief John Morris ("Chief Morris"), Sheriff Hayes, Chief Raley and the County Commissioners for Etowah County (the "Commissioners").
 
 
 10
 The defendants filed two motions for summary judgment based on qualified immunity, one on behalf of the City defendants, the other on behalf of the County defendants. The district court granted summary judgment as to the Commissioners in their individual and official capacities and Sheriff Hayes and Chief Raley in their official capacities.
 
 
 11
 Without explanation, the district court denied summary judgment as to Sheriff Hayes and Chief Raley individually, and Chief Morris officially and individually. This interlocutory appeal followed.[4]
 
 II. ANALYSIS
 
 12
 A district court's denial of qualified immunity is an appealable "final decision" within the meaning of 28 U.S.C. § 1291.[5] Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); Green v. Brantley, 941 F.2d 1146, 1148 (11th Cir.1991) (en banc); Waldrop v. Evans, 871 F.2d 1030, 1032 n. 1 (11th Cir.1989). As a question of law, it is reviewed de novo. James v. Douglas, 941 F.2d 1539, 1542 (11th Cir.1991); Rich v. Dollar, 841 F.2d 1558, 1563 (11th Cir.1988). Moreover, when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff. Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1503 (11th Cir.1990).
 
 
 13
 Qualified immunity shields government officials performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[6] Qualified immunity is available to government officials whose "actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The rights at stake must have been clearly established in light of pre-existing law so that "a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640, 107 S.Ct. at 3039. The focus, therefore, is on the "objective legal reasonableness" of the officials' actions. Id. at 639, 107 S.Ct. at 3038. Specifically, we look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred.[7] Anderson, 483 U.S. at 641, 107 S.Ct. at 3039; Stewart, 908 F.2d at 1503; Waldrop, 871 F.2d at 1033; Clark v. Evans, 840 F.2d 876, 881 (11th Cir.1988).
 
 
 14
 We begin by observing that the right to be free from deliberate indifference to psychological needs was clearly established at the time of the Decedent's incarceration. Waldrop, 871 F.2d at 1033; Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (prison officials who show deliberate indifference to an inmate's serious medical needs violate the Eighth Amendment's proscription against unnecessary and wanton infliction of pain).
 
 
 15
 We then turn to the question of whether Hardin has adduced evidence sufficient to create a genuine issue of material fact as to whether the defendants violated those rights. Stewart, 908 F.2d at 1503.
 
 
 16
 Hardin alleges that the Decedent's rights were violated almost from the moment of her arrest. She alleges that the first violation occurred when the Decedent was pushed frontally naked and then beaten in the City jail's booking area.[8] Hardin also alleges that the City's failure to implement a federal consent decree requiring certain procedures for the health care of City prisoners raises a fact question of deliberate indifference as to the Decedent. Finally, Hardin alleges that the Decedent's bizarre behavior--which included beating her head against the bars of her cell, stabbing a jail matron in the hand and herself in the throat with a pen, defecating on the floor of her cell, eating her own waste and choking to death on a bar of soap--raises factual questions as to the appellants' deliberate indifference. We have examined the tragic facts of this case closely, and while they may raise questions of deliberate indifference as to the conduct of other parties, we cannot conclude that the actions of the appellants before us constituted deliberate indifference.
 
 A. Chief Morris
 
 17
 Chief Morris is entitled to qualified immunity. The record is devoid of evidence linking any action of Chief Morris to the alleged mistreatment of the Decedent. In fact, Chief Morris testified at his deposition that the Decedent came to his attention only three times during her two and one half day incarceration: 1) at the time of her arrest (via an arrest report); 2) after the stabbing incident in Etowah County, after which he ordered his staff to "watch her closely;" and 3) upon the decedent's death. There is no evidence Chief Morris ever interacted with or even saw the Decedent during her stay at the City jail. Based upon the record before us, we cannot conclude that Chief Morris's actions violated the Decedent's constitutional rights.
 
 
 18
 Chief Morris is likewise immune from suit in his official capacity. Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability. See Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986). Supervisory officials "[can]not be held liable under section 1983 for having the 'mere right to control without any control or direction having been exercised.' " Gilmere v. Atlanta, 774 F.2d 1495, 1504 (11th Cir.1985) (en banc), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986) (quoting Monell, 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58).
 
 
 19
 A supervisor may be liable under section 1983 if he or she participates directly in acts constituting a constitutional violation, or if the challenged actions are causally connected to a constitutional violation, H.C. v. Jarrard, 786 F.2d 1080, 1086-87 (11th Cir.1986). However, the record before us, viewed in the light most favorable to Hardin, reflects no action by Chief Morris that violated the Decedent's constitutional rights.
 
 
 20
 Moreover, we find meritless Hardin's claim that the City's failure to implement a federal consent decree requiring certain procedures for the health care of City prisoners raises a fact question as to Chief Morris's alleged deliberate indifference toward the Decedent. Chief Morris had nothing to do with the Decedent while she remained at the City jail. In no way did the procedures or policies for which Chief Morris was responsible act to deny or delay necessary medical treatment. Indeed, upon the Decedent's arrival, fire medics were summoned to examine her. The City provided medical care to the Decedent during her time in the County jail, including a psychological evaluation from a social worker. Based upon the foregoing facts we cannot conclude that the City's alleged failure to comply with the consent decree raises a question of fact as to Chief Morris's alleged deliberate indifference toward the Decedent.
 
 B. Chief Raley and Sheriff Hayes
 
 21
 Similarly, there is no evidence in the record that Chief Raley or Sheriff Hayes violated the Decedent's constitutional rights. Chief Raley testified at his deposition that he first learned of the Decedent on the afternoon of May 30, after she banged her head against the bars of her jail cell and stabbed with a pen the matron who came to offer assistance. Chief Raley observed the Decedent and instructed his subordinates to call fire medics to check on her. He then ordered a subordinate to have the City take the Decedent to the hospital for treatment.
 
 
 22
 Chief Raley did not see the Decedent again until the next day, May 31, after the City returned her to the County jail. During a routine inspection of the prisoners, Chief Raley observed the Decedent sitting still on her bunk. Chief Raley neither saw the Decedent nor heard anything about her for the rest of the day.
 
 
 23
 The following day, June 1, Chief Raley and Sheriff Hayes met in Chief Raley's office after interviewing a candidate for the Sheriff's Department. The candidate left the office but returned to summon Sheriff Hayes and Chief Raley to the Decedent's cell. There, they observed the Decedent pacing in her partially flooded cell, in which excrement lay on the floor. Chief Raley ordered that the water supply to the Decedent's cell be turned off. Sheriff Hayes then ordered Chief Raley to call the City to retrieve its prisoner, which he did. Chief Raley then met in his office with Sheriff Hayes for a few minutes, returned to the Decedent's cell to check on her, then left in an elevator with Sheriff Hayes as City police and fire medics arrived. Up to this point, the Decedent showed no visible signs of distress. Chief Raley had no further contact with the Decedent.
 
 
 24
 We conclude that, in light of the information he possessed, Chief Raley acted reasonably under the circumstances and did not violate the Decedent's Eighth Amendment rights. At no time did Chief Raley deny the Decedent adequate medical or psychological care. Indeed, Chief Raley acted to ensure that the Decedent's medical needs were met based on the information available to him. Nor did Chief Raley witness or hear about behavior which clearly indicated the Decedent was in severe need of psychological help.[9]
 
 
 25
 The deliberate indifference standard is met only if there is "a 'strong likelihood, rather than a mere possibility,' that self-infliction of harm would result." Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir.1989) (quoting State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir.1983)). In light of the fact that the Decedent had not previously attempted suicide, nor made suicide threats, we cannot conclude that there was a strong likelihood of self-inflicted harm. See Popham v. Talladega, 908 F.2d 1561, 1564 (11th Cir.1990) ("Absent knowledge of a detainee's suicidal tendencies ... failure to prevent suicide has never been held to constitute deliberate indifference."); Edwards, 867 F.2d at 1276.[10] Moreover, the Decedent's death, due to choking on a bar of soap, was deemed to be accidental and not suicide. Chief Raley could not have known of the possibility that the Decedent might choke to death on a bar of soap.
 
 
 26
 Based on the record evidence, a reasonable jailer could have believed that it was constitutional to behave as Chief Raley did. We must conclude, therefore, that Chief Raley was not deliberately indifferent to the Decedent's potential for self-harm or serious psychological needs. Accordingly, he is entitled to qualified immunity.
 
 
 27
 Based upon the foregoing facts, Sheriff Hayes is likewise entitled to summary judgment based on qualified immunity. Sheriff Hayes's sole knowledge of the Decedent prior to June 1 consisted of a report reaching him of an "altercation" involving an unnamed City inmate. He testified at his deposition that he knew nothing of the Decedent's specific activities, nor did he see her, until June 1. Based on this record, we cannot conclude that Hardin has met her burden of showing a genuine issue of material fact as to the actions of Sheriff Hayes.
 
 III. CONCLUSION
 
 28
 We conclude there is no evidence in the record sufficient to create a genuine issue of material fact as to the actions of Chief Morris, Chief Raley, and Sheriff Hayes which would constitute any violation of the Decedent's Eighth Amendment rights.[11] They are entitled to summary judgment based on the doctrine of qualified immunity. Accordingly, we reverse the district court's order and remand this case for further proceedings consistent with this opinion.[12]
 
 
 29
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Section 1983 states, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [2]
 The Eighth Amendment proscribes the imposition of "cruel and unusual punishments." U.S. Const. amend. VIII. This Amendment applies to the states through the Fourteenth Amendment. Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947)
 
 
 [3]
 These injuries do not appear to have been serious. The Decedent received several stitches for her forehead injury and superficial treatment for the injury to her throat
 
 
 [4]
 In addition, the City moved for summary judgment, but its motion was also denied. The City, however, has filed no notice of appeal. The timely filing of such notice is "mandatory and jurisdictional." United States v. Robinson, 361 U.S. 220, 224, 80 S.Ct. 282, 285, 4 L.Ed.2d 259 (1960). Therefore, although the City argued orally before us, we will not consider its appeal. See Fed.R.App.P. 3(a)
 
 
 [5]
 Federal appellate courts "have jurisdiction of appeals from all final decisions of the district courts of the United States ... except where a direct review may be had in the Supreme Court." 28 U.S.C. § 1291
 
 
 [6]
 Although Harlow was a suit against federal, not state officials, there is no distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials. 457 U.S. at 818, n. 30, 102 S.Ct. at 2738 n. 30
 
 
 [7]
 These requirements ensure that a reasonable official understands that what he or she is doing violates the right asserted. The doctrine balances society's interest in providing a remedy for injured victims and discouraging unlawful conduct with that of enabling public officials to act independently and without fear of consequences. Harlow, 457 U.S. at 819, 102 S.Ct. at 2738
 
 
 [8]
 In support of these facts, Hardin submitted a videotape allegedly depicting the Decedent, frontally naked, being pushed through the City jail's booking area. Hardin alleges the tape's audio portion contains evidence of the Decedent being beaten off-camera. We have examined this videotape closely and found its video portion so technically flawed as to be useless. The audio portion is likewise inconclusive. However, Chief Morris, at his deposition, confirmed that the videotape indeed depicted the Decedent frontally naked in the City jail booking area. We therefore accept as true Hardin's allegations regarding the Decedent's state of undress at that time. Chief Morris did not testify as to the alleged off-camera beating
 
 
 [9]
 While a fellow prisoner, Robert Taylor ("Taylor"), stated that on June 1 he witnessed the Decedent eating her own waste, he never communicated this information to Sheriff Hayes or Chief Raley. According to Taylor's uncorroborated statement to the Alabama Bureau of Investigation,
 "[On June 1, he] observed [the Decedent] eating her own waste. He observed that she had flooded her cell with water. TAYLOR told her several times to sit down before she fell and hurt herself. TAYLOR told [Sheriff Hayes] and Chief RAILEY [sic] that something was wrong with her. They went and checked on her. The sheriff told Chief RAILEY [sic] to contact the Gadsden Police Department and to have her removed from the jail. The sheriff said that he wanted paramedics to check her before she left the jail. Chief RAILEY [sic] contacted the police department in reference to the sheriff's orders."
 Even accepting as true Taylor's statement, we cannot conclude that Chief Raley and Sheriff Hayes acted with deliberate indifference to the Decedent's serious medical or psychological needs. Taylor reported only that "something was wrong" with the Decedent. Chief Raley and Sheriff Hayes responded immediately to check on the Decedent and summoned paramedics.
 Moreover, while the record is replete with examples of bizarre behavior witnessed by jail personnel and other prisoners, the record before us is barren regarding evidence that Chief Raley or Sheriff Hayes ever learned of such behavior.
 
 
 [10]
 While the Decedent did strike herself in the throat with a pen, the wound was superficial, and cannot be characterized as the result of a suicide attempt
 
 
 [11]
 Hardin has failed to show that these appellants have participated in actions which could reasonably be known to violate the Decedent's constitutional rights. We do not render an opinion as to whether other City or County personnel might have engaged in conduct violative of the Decedent's rights. We hold only that, under these facts, viewed in the light most favorable to Hardin, these particular appellants may not be held liable for the violations alleged
 
 
 [12]
 Because Hardin's federal suit against the City remains viable, this opinion in no way affects the adjudication of her pendant state claim which is also pending in the district court