51 F.3d 988
 Tom SWINT; Tony Spradley; Drecilla James and Jerome Lewis,
Plaintiffs-Appellees,
v.
The CITY OF WADLEY, ALABAMA; Freddie Morgan and Gregory
Dendinger in their official and individual
capacities; Chambers County Commission,
Defendants-Appellants,
Chambers County Sheriff's Department, Defendant,
James C. Morgan, in his official and individual capacity,
Defendant-Appellant.
 No. 92-6574.
 United States Court of Appeals,
Eleventh Circuit.
 May 9, 1995.
 
 Ernestine Sapp, Fred D. Gray, Tuskegee, AL, for City of Wadley, AL, et al.
 Kendrick E. Webb, Bart Harmon, Roy W. Granger, III, Montgomery, AL, for TCM, et al.
 Carlos A. Williams, Mobile, AL, for appellees.
 Appeal from the United States District Court for the Middle District of Alabama.
 ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES
 Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and BRIGHT*, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 
 1
 The Supreme Court has vacated the part of our prior judgment in this case that ordered the district court to enter summary judgment in favor of the County Commission on Counts I and II of the complaint. In compliance with the Supreme Court's decision, we vacate our prior opinions in this case, Swint v. City of Wadley, 5 F.3d 1435 (11th Cir.1993), modified, 11 F.3d 1030 (1994), and substitute the following opinion:
 
 
 2
 This civil rights case, involving allegations of police misconduct, was filed by four citizens against the City of Wadley, Alabama, the Chambers County Commission, and three individual defendants: Wadley Police Chief Freddie Morgan, Officer Gregory Dendinger, and Chambers County Sheriff James C. Morgan. Before us is the appeal of Chief Morgan, Officer Dendinger, and Sheriff Morgan from the district court's denial of their qualified immunity summary judgment motions. Also before us is the request by the City of Wadley and the Chambers County Commission that we exercise jurisdiction under either the collateral order or pendent appellate doctrines to review the district court's denial of their summary judgment motions. The City contends the district court should have held that the Chief of Police did not have final decisionmaking authority over the relevant actions, and thus the City was not liable for his conduct. Similarly, the County Commission contends the court should have held that under Alabama law the Sheriff was not the final repository of county law enforcement authority, and thus the County was not liable for his actions. The City, Chief Morgan, and Officer Dendinger also urge us to review, under either the collateral order or pendent appellate jurisdiction doctrine, the district court's denial of their summary judgment motion as to the state law claims against them.
 
 
 3
 We affirm the district court's denial of the individual defendants' qualified immunity summary judgment motions insofar as the Fourth Amendment is concerned, and we also affirm the denial of summary judgment on qualified immunity grounds insofar as the equal protection claims against Officer Dendinger and Chief Morgan are concerned. We reverse the denial of summary judgment to Sheriff Morgan on the equal protection claims, and we reverse the denial of summary judgment on qualified immunity grounds to all three individual defendants on the due process claims. We hold that jurisdiction to review the rulings on the denial of the motions for summary judgment on grounds other than qualified immunity does not exist under the collateral order doctrine. Furthermore, we do not possess pendent appellate jurisdiction to review the denials of the City's and Commission's motions for summary judgment, and if we do possess pendent issue jurisdiction over the individual defendants' other pendent issues, we decline to exercise such jurisdiction.
 
 I. BACKGROUND
 A. STATEMENT OF FACTS
 
 4
 In considering the denial of a defendant's summary judgment motion, we are required to view the facts, which are drawn from the pleadings, affidavits, and depositions, in the light most favorable to the plaintiffs. E.g., Hardin v. Hayes, 957 F.2d 845, 848 (11th Cir.1992); Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1503 (11th Cir.1990). Any qualified immunity defenses that do not result in summary judgment before trial may be renewed at trial, where the actual facts will be established. Compare Adams v. St. Lucie County Sheriff's Dep't, 962 F.2d 1563, 1567 n. 2 (11th Cir.1992) (non-majority opinion of Hatchett, J.) (dictum) with id. at 1579 n. 8 (dissenting opinion of Edmondson, J.) (dictum).[1] Thus, what we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motions may not be the actual facts. They are, however, the facts for present purposes, and we set them out below.
 
 
 5
 This lawsuit stemmed from two law enforcement raids on the Capri Club ("the Club"), a nightclub located in Chambers County, Alabama. Although outside any city limits, the Club is within the police jurisdiction of the City of Wadley, a community located in Randolph County, Alabama. Plaintiffs Tom Swint and Tony Spradley are owners of the Club; plaintiff Drecilla James is a Club employee who was present during both of the raids; Jerome Lewis is a Club patron who was present during the second raid. All four plaintiffs are black. The three individual defendants--Chief Morgan, Officer Dendinger, and Sheriff Morgan--are all white. Each was sued in both his official and individual capacities. The Chambers County Commission and the City of Wadley are the other defendants.
 
 
 6
 In response to complaints that drug transactions were being conducted in the Club, the Chambers County Sheriff's Department and the City of Wadley Police Department engaged in a preliminary narcotics investigation of the Club. This investigation culminated in a recommendation from Chambers County Sheriff's Investigator Timothy Birchfield to Sheriff Morgan for a raid on the Club. Sheriff Morgan "approved the narcotics investigation and operation at the Club."
 
 
 7
 The raid was conducted by the Chambers County Drug Task Force, consisting of units from the Chambers County Sheriff's Department and the police departments of the cities of Lafayette, Lanett, and Valley, Alabama. Joining the Task Force for this operation were representatives of the City of Wadley Police Department and the Alabama Alcoholic Beverage Control Board. The total strength assembled by the Task Force for the raid was 30 to 40 law enforcement officers. In accordance with the operation plan apparently devised by Investigator Birchfield, an undercover officer and a confidential informant entered the Club on December 14, 1990, while the other Task Force members remained out of sight. While inside, the undercover officer was offered marijuana and crack cocaine for sale by a patron of the Club. After purchasing these drugs, the officer left the Club and signaled for the raid to begin.
 
 
 8
 Initial entry of the Club was made by the City of Lanett, Alabama, SWAT team consisting of approximately eight officers. The team was dressed in black and at least some of the members wore ski masks to conceal their identities. Within 30 seconds of the SWAT team's entry, the other members of the Task Force entered. The person who had sold the undercover officer drugs was identified and arrested. The Task Force officers pointed their weapons at plaintiffs Spradley and James and others who were present. Participants in the raid searched the Club's cash register and door receipts, and some currency was confiscated from the door receipts. Persons inside the Club were prohibited from moving or leaving until the raid, which lasted one to one and one-half hours, was over. Those present were not allowed to go to the restroom. When one man asked for permission, Officer Dendinger replied, "Shut up, or I'll shut you up myself." When plaintiff James told Chief Morgan that she was so scared that she had to go to the restroom, he said no. Another officer also refused her request to use the Club's restroom facilities, telling her she would have to go behind the building. During this first raid, illegal liquor was seized by an Alabama Alcohol Beverage Control Board officer who participated in the raid, and several minors were found inside the Club. Only two people were arrested during this entire raid: the man who sold the undercover officer drugs; and that man's younger brother, a minor, who had in his possession some of the marked money the undercover agent had paid for the drugs.
 
 
 9
 After the December 14, 1990, raid, additional narcotics-related complaints were received by the Chambers County Sheriff's Department. In response, Sheriff Morgan directed that Birchfield investigate activities at the Club to ascertain whether a second operation was required. Birchfield investigated and recommended another operation; Sheriff Morgan authorized it.
 
 
 10
 The second raid was conducted on March 29, 1991, and it was virtually identical in procedure to the first. Again, an undercover agent went inside first and purchased drugs. After the premises were secured this time, however, the Task Force participants could not find the man who had sold drugs to the undercover officer. During this second raid, law enforcement officials chambered rounds of ammunition into their weapons, pointed them, and ordered persons in the Club to get down on the floor. Some of those present in the Club during this raid were searched, including plaintiff Lewis. During the process of being searched, Lewis was pushed outside the Club, grabbed, and shoved against a wall. After being searched, Lewis was forced to go back inside the Club until the raid was concluded. Another patron was pushed off a bar stool. Some of the employees, including plaintiff James, had guns held on them during this raid, which lasted from one to one and one-half hours. At one point, an officer, with his finger on the trigger, pointed a shotgun at Lewis' face. No one was arrested during or because of this second raid.
 
 
 11
 During one of the raids, an unidentified officer said they would be coming back and would not stop until the Club was closed. No other law enforcement operation of this nature had been conducted during Sheriff Morgan's twenty-one year tenure as Sheriff of Chambers County. Chief Morgan and Officer Dendinger personally participated in both raids. Sheriff Morgan was not physically present during either raid, but he authorized both of them.
 
 B. COURSE OF PROCEEDINGS
 
 12
 The plaintiffs' complaint, which seeks declaratory, injunctive, and compensatory relief, avers the following four counts[2]:
 
 
 13
 Count I: Deprivation of Civil Rights, 42 U.S.C. Secs. 1981, 1983 and 1985 for violations of plaintiffs' rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments;
 
 
 14
 Count II: Conspiracy to deny plaintiffs' constitutional rights;
 
 
 15
 Count III: Pendent state claims alleging assault and false imprisonment;
 
 
 16
 Count IV: Pendent state claims alleging negligence.
 
 
 17
 All the defendants moved to dismiss, and their motions were granted in part and denied in part by the district court. Citing Jett v. Dallas Independent School District, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the district court dismissed the 42 U.S.C. Sec. 1981 claims against all defendants. The court dismissed on Eleventh Amendment grounds the claims against Sheriff Morgan in his official capacity to the extent plaintiffs seek money damages. The court also dismissed the complaint against the Chambers County Sheriff's Department. None of those dismissals is before us for review.
 
 
 18
 All remaining defendants filed motions for summary judgment. In response, the district court granted judgment against the plaintiffs as follow:
 
 
 19
 1. On Count I insofar as the plaintiffs claimed a right under the Sixth Amendment to be informed of the accusations against them;
 
 
 20
 2. On Count II insofar as the plaintiffs claimed a right to association, speech and movement;
 
 
 21
 3. On Counts III and IV as to the Chambers County Commission;
 
 
 22
 4. On Count III as to Sheriff Morgan;
 
 
 23
 5. On Count III as to the City on the claims of false imprisonment only; and
 
 
 24
 6. On Count IV as to Officer Dendinger.
 
 
 25
 In all other respects, the defendants' motions for summary judgment were denied.
 
 II. DISCUSSION
 
 26
 A. THE INDIVIDUAL DEFENDANTS' APPEAL OF THE DENIAL OF SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS
 
 1. Qualified Immunity Law
 
 27
 The district court denied the three individual defendants' motions for summary judgment on qualified immunity grounds. The denial of qualified immunity is a question of law to be reviewed de novo. Hardin v. Hayes, 957 F.2d 845, 848 (11th Cir.1992). In addition, "when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff." Id. The rudiments of the qualified immunity defense are well established:
 
 
 28
 When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. If sued "individually," a municipal officer may raise an affirmative defense of good faith, or "qualified," immunity.
 
 
 29
 Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir.1991) (citations omitted). The test for qualified immunity was announced by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):
 
 
 30
 [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 31
 Id. at 818, 102 S.Ct. at 2738.
 
 
 32
 Although the cases sometimes refer to the doctrine of qualified "good faith" immunity, the test is one of objective legal reasonableness, without regard to whether the government official involved acted with subjective good faith. Courson v. McMillian, 939 F.2d 1479, 1487 (11th Cir.1991). "[W]e look to whether a reasonable official could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." Hardin, 957 F.2d at 848. Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Courson, 939 F.2d at 1487 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).
 
 
 33
 In conducting the objective legal reasonableness inquiry, this Court has defined the following framework for analysis:
 
 
 34
 In Zeigler v. Jackson, [716 F.2d 847, 849 (11th Cir.1983),] this Court established a two-step analysis to be used in applying the Harlow test: the defendant government official must prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," and then the burden shifts to the plaintiff to demonstrate that the defendant "violated clearly established constitutional law."
 
 
 35
 Sammons v. Taylor, 967 F.2d 1533, 1539 (11th Cir.1992). The plaintiffs do not contest that the individual defendants were acting within their discretionary authority when they authorized or participated in the two raids. Thus, the first step of the analysis is satisfied.
 
 
 36
 The dispute is over the second step of the analysis: whether the rights alleged to have been violated were "clearly established" law at the time of the action. The Supreme Court has revisited this question a number of times:
 
 
 37
 [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 38
 Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted).
 
 
 39
 2. The Constitutional Norms Relied Upon By Plaintiffs
 
 
 40
 The district court granted defendants' summary judgment on qualified immunity grounds as to the First and Sixth Amendment claims, but denied it as to the Fourth Amendment, due process, and equal protection claims, concluding "that the law was clearly established in December, 1990, and in March, 1991" that the alleged conduct violated those constitutional provisions.
 
 
 41
 a. The Fourth Amendment Claims
 
 
 42
 The district court found that it was "clearly established ... that a raid of a business establishment violates the Fourth Amendment unless based on probable cause and exigent circumstances...." Indeed it was. Well before the events of December 1990 and March 1991, this Court observed:
 
 
 43
 The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are "per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions."
 
 
 44
 United States v. Alexander, 835 F.2d 1406, 1408 (11th Cir.1988) (quoting Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). Long before the raids at issue in this case, the Supreme Court, summarizing preexisting law, noted that "[a]bsent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant." Donovan v. Dewey, 452 U.S. 594, 598 n. 6, 101 S.Ct. 2534, 2538 n. 6, 69 L.Ed.2d 262 (1981). The Court specifically added that "these same restrictions pertain when commercial property is searched for contraband or evidence of crime." Id. Our cases have stressed that:
 
 
 45
 [o]nly in the face of "exigent circumstances," where obtaining a warrant would greatly compromise important law enforcement objectives, does the warrant requirement yield. When exigent circumstances coexist with probable cause, the Fourth Amendment has been held to permit warrantless searches and seizures.
 
 
 46
 United States v. Pantoja-Soto, 739 F.2d 1520, 1523 (11th Cir.1984) (citations omitted), cert. denied, 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985).
 
 
 47
 Defendants argued before the district court that "[t]he search in the case here was pursuant to probable cause and exigent circumstance[s]...." Probable cause, a pure question of law, "exists when under the 'totality-of-the-circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir.) (en banc) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)), cert. denied, 502 U.S. 907, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). In other words, "facts [which would] lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime' " will support a finding of probable cause. United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir.1983) (quoting United States v. Rojas, 671 F.2d 159, 165 (5th Cir. Unit B 1982)).
 
 
 48
 Nonetheless, the question for purposes of the individual defendants' qualified immunity defense is not whether probable cause actually existed. Instead, "[w]hen a law enforcement officer seeks summary judgment on the basis of qualified immunity, we only must ask whether, viewing the facts in a light favorable to the non-movant, there was arguable probable cause." Moore v. Gwinnett County, 967 F.2d 1495, 1497 (11th Cir.1992) (emphasis in original), cert. denied, --- U.S. ----, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). Thus, we determine "whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir.1990); accord Moore, 967 F.2d at 1497-98. In Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court acknowledged that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... that in such cases those officials ... should not be held personally liable." Id. at 641, 107 S.Ct. at 3039-40; accord Von Stein, 904 F.2d at 579.
 
 
 49
 Based on the record before us, read in a light favorable to the plaintiffs, we cannot conclude that the individual defendants had even arguable probable cause to conduct the extensive raids of the Club, which included a search of the premises, the seizure of all employees, patrons, and owners present, and the search of some of those who were detained. Stated somewhat differently, law enforcement officers in the position of these individual defendants could not reasonably have concluded that adequate probable cause existed to justify the searches and seizures that occurred. Chief Morgan testified in deposition that approximately a month before the first raid, he had received information from a reliable confidential informant regarding the sale of narcotics inside the Club. Chief Morgan noted that this source had previously assisted authorities in obtaining convictions of other suspects. According to Chief Morgan, the informant identified several individuals allegedly involved in the sale of drugs. Likewise, Sheriff Morgan testified that he relied on information from a reliable informant in authorizing the March 29, 1991, raid. However, none of those persons identified by these informants were owners or employees of the Club; therefore, the search of the Club's cash register and door receipts was presumptively unreasonable. Moreover, the defendants have offered no evidence that all of the patrons of the Club who were detained at gunpoint and randomly searched were previously identified as engaged in the narcotics trade, or that the defendants had any reason whatsoever to believe that all of the patrons were involved in illegal activity. Absent such evidence or reason to believe, there was not even arguable probable cause to seize and detain every patron and employee of the Club for an hour and a half and search many of those present.
 
 
 50
 Defendants direct our attention to the consummated drug transactions that preceded each of the raids. Immediately before each raid, an undercover agent did complete a single drug buy from one person inside the Club. There is no question that probable cause existed to arrest and search the narcotics peddler on each of the two occasions. Within minutes of the entry of the SWAT team and other members of the Task Force at the beginning of the December 14, 1990, raid, the drug seller was identified, arrested, and removed from the premises. After entry during the March 29, 1991, raid, officers attempted in vain to identify and find the one who had sold drugs to the undercover officer a few minutes earlier. If that had been the extent of the intrusion on these two occasions, this would be a different case. But that was not the end of the intrusion. On the contrary, the officers proceeded to detain at gunpoint dozens of citizens for an hour and a half, search a number of them, and search the premises as well. In the process, the officers completely disrupted the business of the Club. All of this was done without even arguable probable cause to justify anything beyond the search and arrest of a single individual on each occasion.
 
 
 51
 Defendants have cited no authority that even suggests that the search and seizure of one suspect in a public place can be bootstrapped into probable cause for a broad-based search of the business establishment and its patrons. More than a decade before the raids in this case, the Supreme Court clearly established the constitutional impropriety of what was done in this case. In Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Illinois Bureau of Investigation obtained a search warrant authorizing the search of the Aurora Tap Tavern and of the person of the bartender. In the ensuing search, one officer proceeded to pat down each of the nine to thirteen customers in the tavern. In the course of the patdown of patron Ventura Ybarra, heroin was found. The Supreme Court reversed the resulting conviction on Fourth Amendment grounds with an observation that could have been penned for this case as well: "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. at 91, 100 S.Ct. at 342. The Fourth Amendment, declared the Court, affords "individualized protection":
 
 
 52
 Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.
 
 
 53
 Id. (citing Rakas v. Illinois, 439 U.S. 128, 138-43, 148-49, 99 S.Ct. 421, 427-30, 433, 58 L.Ed.2d 387 (1978); Katz v. United States, 389 U.S. 347, 351-52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). Each citizen is "clothed with constitutional protection against an unreasonable search or an unreasonable seizure," id., and does not shed that protection at the door of the Tap Tavern in Aurora, Illinois, or at the door of the Capri Club in Wadley, Alabama. Probable cause to arrest one suspect, and even probable cause to believe that a number of other or unidentified people had sold drugs in the establishment in the past, did not give the officers carte blanche to seize everyone who happened to be in the Club when the two raids took place.
 
 
 54
 We believe it was equally clear in December of 1990 that the arrest of the one person who had sold drugs to the undercover officer did not entitle the officers to search the entire premises in which he was located. The permissible scope of searches incident to arrests was defined by the Supreme Court in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969):
 
 
 55
 Application of sound Fourth Amendment principles to the facts of this case produces a clear result. The search here [of the defendant's entire home subsequent to his arrest] went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area.
 
 
 56
 Id. at 768, 89 S.Ct. at 2043. The defendants had no warrant to search the Club and seize its occupants; they lacked even arguable probable cause to engage in such conduct; and their activities exceeded the bounds of a lawful search incident to an arrest. Under law that had been clearly established years before, the actions alleged to have occurred during the two raids violated the Fourth Amendment. No reasonable law enforcement officer in the circumstances presented here could have believed that probable cause existed to search the entire Club and seize all of its occupants.
 
 
 57
 Defendants place great weight on their contention that exigent circumstances justified the broad search and seizures that occurred during the raids on the Club. We have explained that "[t]he exigent circumstance doctrine provides that when probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained, a warrantless search and seizure can be justified." United States v. Young, 909 F.2d 442, 446 (11th Cir.1990), cert. denied, 502 U.S. 825, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991). We need not address defendants' exigent circumstances argument, because it is well-settled that under this doctrine, "warrantless searches and seizures ... [require that] both probable cause and exigent circumstances exist." United States v. Burgos, 720 F.2d at 1525. Having concluded that the defendants lacked even arguable probable cause for anything beyond a search and seizure of the two suspects who had actually engaged in narcotics transactions, we find it unnecessary to decide whether a reasonable officer could have believed that sufficient exigent circumstances existed to excuse the warrant requirement if there had been probable cause to justify the actions that occurred.
 
 
 58
 Defendants argue there was no violation of plaintiffs' rights, because the two raids were administrative searches of the Club to which the Club owners had previously consented. Even in the context of administrative searches of business property, however, the Fourth Amendment limits warrantless searches: "[P]rior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property." Donovan v. Dewey, 452 U.S. 594, 598, 101 S.Ct. 2534, 2537-38, 69 L.Ed.2d 262 (1981). While "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment," id. at 598, 101 S.Ct. at 2538, pretextual administrative searches do:
 
 
 59
 [T]he Fourth Amendment protects the interest of the owner of property in being free from unreasonable intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests. Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials.
 
 
 60
 Id. at 599, 101 S.Ct. at 2538 (citations omitted) (emphasis in original). Thus, where an act authorizing administrative inspections "fails to tailor the scope and frequency of such administrative inspections to the particular" governmental concern, and "does not provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search," a search warrant will be required. Id. at 601, 101 S.Ct. at 2539 (citing Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (holding that absent consent a warrant was constitutionally required in order to conduct administrative inspections under Sec. 8(a) of OSHA)).
 
 
 61
 The facts viewed favorably to plaintiffs simply will not support an administrative search theory. Administrative inspections conducted on the Club and its predecessor establishment both before and after the two raids at issue in this case were accomplished without the massive show of force and excessive intrusion witnessed in the December 1990 and March 1991 raids. Moreover, during the two raids the officers did not simply search for violations of the liquor laws by the establishment; instead, a number of people were searched for evidence of their violation of drug laws, searches to which they did not consent as part of any regulatory scheme. No reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches.
 
 
 62
 Sheriff Morgan advances another argument on the question of whether a genuine issue of fact exists as to whether he "engaged in conduct violative of the rights established by ... clearly-established law." Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir.1988). Although Sheriff Morgan acknowledges that he authorized both of the raids on the Club, he nonetheless contends that he could not have violated plaintiffs' rights because he was not personally involved in conducting the raids. According to the Sheriff, "the focus must center on the actions taken by [him] and the information he possessed in taking those actions." This argument fails for at least two reasons. First, although Sec. 1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, "[p]ersonal participation ... is only one of several ways to establish the requisite causal connection." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986); see also Sims v. Adams, 537 F.2d 829, 831 (5th Cir.1976). Interpreting the Supreme Court's decision in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), this Court has observed that "it is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." Williams v. Bennett, 689 F.2d 1370, 1381 (11th Cir.1982), cert. denied, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Thus, personal participation is not the sine qua non for Sheriff Morgan to be found personally liable under Sec. 1983. "[L]iability may be imposed due to the existence of an improper policy or from the absence of a policy." Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.1991) (summarizing preexisting law); see also Zatler, 802 F.2d at 402 ("[A]ny alleged failure to adopt adequate policies for inmate protection must amount to a breach of [defendant's] duty and must evidence reckless disregard or deliberate indifference to [plaintiff's] constitutional rights.").
 
 
 63
 Second, and equally compelling, there were two raids in this case during which allegedly unconstitutional conduct occurred. Sheriff Morgan bases his claim to qualified immunity on his lack of personal involvement in and his lack of knowledge as to the details regarding the conduct of both raids. Citing this Court's opinion in Hardin v. Hayes, 957 F.2d 845 (11th Cir.1992), Sheriff Morgan urges us to focus on the information he possessed at the time he authorized the raids. We do so, but we cannot ignore the stark factual distinction between Hardin and the present case: In Hardin there was one suicide; in this case there were two raids. Indeed, at oral argument, Sheriff Morgan's counsel conceded that after the first raid, Sheriff Morgan was debriefed on how the raid had been conducted. Counsel further acknowledged that what happened at the second raid was materially identical to the events of the first raid. Thus, even if Sheriff Morgan had a reasonable basis for believing that his policies and training were adequate going into the first raid, that fails to explain why he authorized exactly the same conduct three months later in March of 1991, when he had reason to know better.
 
 
 64
 Similarly, even if Chief Morgan and Officer Dendinger had not been fully aware of the Task Force's plan of attack before the first raid, as participants in the first raid they had ample opportunity to determine before the second raid was conducted whether the first had comported with constitutional requirements. Upon learning of the manner in which the first raid was conducted, reasonable law enforcement officials would have been on notice that clearly established Fourth Amendment rights had been violated. Willingness to engage in the second raid demonstrated deliberate indifference to those rights, and it reflected accession to and adoption of the policies and procedures employed.
 
 
 65
 We hold that the law was clearly established in December of 1990 and March of 1991 that the Fourth Amendment proscribed the alleged conduct that law enforcement officials, including the individual defendants, engaged in connection with the raids on the Club. Finding that the plaintiffs have, at a minimum, raised a genuine issue of material fact as to whether these defendants engaged in such conduct, we conclude that the district court properly denied the defendants' motions for summary judgment on qualified immunity grounds as to the Fourth Amendment claims.
 
 
 66
 b. The Equal Protection Clause Claims
 
 
 67
 The district court also held that " 'the equal protection right to be free from intentional racial discrimination' was clearly established," and found "sufficient evidence [adduced by plaintiffs] to create a genuine issue of material fact as to whether the raids may have been racially motivated." The court specifically pointed to: the statement of Officer Dendinger to Mattie Staples regarding the intention to close the Club down because of the race of the owners and patrons; Sheriff Morgan's deposition testimony that the black-owned Club was the only one raided in his twenty-one years as sheriff; and evidence of a higher incidence of DUI offenses for blacks than whites in the vicinity of the Club. The court acknowledged that this evidence had "mixed implications," but held that it was sufficient to raise triable issues of fact.
 
 
 68
 Defendants do not challenge the district court's holding that at the time of the raids the right to be protected from intentional racial discrimination in law enforcement was clearly established. Instead, they argue that summary judgment should have been granted because there was no genuine issue of material fact that they engaged in such discrimination. Based on our review of the record, we agree with the district court that a genuine issue of material fact does exist about whether Officer Dendinger and Chief Morgan engaged in intentional racial discrimination in authorizing or participating in the raids. Mattie Staples' testimony about Officer Dendinger's alleged statement to her suffices to create a genuine issue of material fact on that issue as to Officer Dendinger and his police chief, Freddie Morgan. The district court properly denied the summary judgment motions as to the equal protection claims insofar as those two defendants are concerned.
 
 
 69
 Sheriff Morgan, however, is a different matter. Neither he, nor any of his deputies, made any statement that he or his department intended to close the Club down because of the race of the owners and patrons. The fact that this club is the only one Sheriff Morgan authorized to be raided in his twenty-one years as sheriff does not prove that he was motivated by racial considerations. The first club raided had to be either black-owned or white-owned, and that it was one instead of the other proves nothing. Likewise, it is hardly surprising that there would be a higher incidence of DUI arrests for blacks than whites in the vicinity of a club that sells alcoholic beverages to a black clientele. Absent some evidence of racially disproportionate arrests compared to the actual incidence of violations by race, there is no basis for inferring racially selective law enforcement. Because there is no evidence that Sheriff Morgan's actions in authorizing the raids on the Club were motivated by intentional racial discrimination, there is no genuine issue of material fact insofar as the equal protection claims relate to him, and the district court erred in denying his summary judgment motion on those claims.
 
 
 70
 c. The Due Process Clause Claims
 
 
 71
 The district court denied the individual defendants' qualified immunity motions as to the due process claims. We conclude that it erred in doing so.
 
 
 72
 To the extent that the due process claims are concerned with the use of excessive force, Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), forecloses any contention that the law was clearly established in 1990 and 1991 that use of excessive force violated the Due Process Clause. In Graham, the Supreme Court held:
 
 
 73
 all claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.
 
 
 74
 Id. at 395, 109 S.Ct. at 1871 (emphasis in original). This Court has recently joined the First, Sixth and Ninth Circuits in purporting to narrow the scope of Graham, by holding "that a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives Graham." Wilson v. Northcutt, 987 F.2d 719, 722 (11th Cir.1993). However, our 1993 decision in Wilson came two years too late to establish the law at the time of the two raids in this case. At the time of these raids, the law was not clearly established that excessive force in connection with a search violated not only the Fourth Amendment but also the Due Process Clause.
 
 
 75
 The complaint suggests that plaintiffs also contend that due process liberty and property rights were violated by a deliberate attempt of the defendants to drive the Club out of business through pretextual law enforcement raids. Plaintiffs rely on a substantially analogous case in which the Ninth Circuit upheld a jury verdict on a Sec. 1983 action based, in part, on an alleged due process violation. Benigni v. City of Hemet, 879 F.2d 473 (9th Cir.1988). In Benigni, the plaintiff owned a restaurant and bar and claimed that constant police harassment of his business and customers forced him to sell the business at a loss. The Ninth Circuit found that "[t]he due process clause protects a liberty or property interest in pursuing the 'common occupations or professions of life.' " Id. at 478 (quoting Schware v. Board of Bar Examiners, 353 U.S. 232, 238-39, 77 S.Ct. 752, 755-56, 1 L.Ed.2d 796 (1957) ("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.")).
 
 
 76
 Under qualified immunity analysis, the question is whether it was clearly established at the time of the raids that the Due Process Clause proscribed attempts by law enforcement to force citizens out of business through the use of repeated and improperly motivated raids of their business establishments. It may have been in the Ninth Circuit by virtue of the Benigni decision, but the courts of appeals generally and this circuit in particular have not addressed the specific question involved. Plaintiffs' counsel conceded as much at oral argument when he stated that he had located no authority that clearly established on these facts a due process right that is separate and distinct from an equal protection right. Because such a due process right was not clearly established at the time of the raids in this case, Sheriff Morgan, Chief Morgan and Officer Dendinger are entitled to qualified immunity on the due process claims. Qualified immunity applies to monetary damages relief, but not to declaratory and injunctive relief. Fortner v. Thomas, 983 F.2d 1024, 1029 (11th Cir.1993). Therefore, the summary judgment motions of the three individual defendants should have been granted as to the due process claims to the extent plaintiffs seek monetary damages.
 
 3. Summary
 
 77
 We hold that the individual defendants in this case have established the defense of qualified immunity as to plaintiffs' due process claims, but not as to the Fourth Amendment claims. We further hold that Officer Dendinger and Chief Morgan did not establish their entitlement to summary judgment on the equal protection claims, but Sheriff Morgan did. Accordingly, the individual defendants' summary judgment motions were properly denied except as to the due process claims, and except as to the equal protection claims against Sheriff Morgan. Judgment should have been entered for all of the individual defendants on the monetary part of the due process claims, and judgment should have been entered for Sheriff Morgan on all aspects of the equal protection claims.B. THE COUNTY COMMISSION'S APPEAL
 
 1. The Jurisdiction Issue
 
 78
 The denial of a motion for summary judgment generally is not a final judgment for purposes of appellate jurisdiction. However, an exception exists where the summary judgment motion is based on a claim of qualified immunity "to the extent that [the denial] turns on an issue of law...." Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); see also McDaniel v. Woodard, 886 F.2d 311, 313 (11th Cir.1989). That is why we reviewed the order denying the summary judgment motions of the individual defendants; those motions were based on the qualified immunity doctrine. Of course, the mere fact that a district court's order includes a denial of qualified immunity does not mean that all issues addressed in that order are immediately appealable. To be appealable the parts of a summary judgment order addressing other issues must independently meet the requirements of the Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), test. Because the County Commission's summary judgment motion was not based upon the qualified immunity doctrine, the exception that permits interlocutory appeals of qualified immunity issues is inapplicable.
 
 
 79
 a. The Cohen Test
 
 
 80
 To satisfy Cohen, an order must: (i) "conclusively determine the disputed question," (ii) "resolve an important issue completely separate from the merits of the action," and (iii) "be effectively unreviewable on appeal from a final judgment." Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 431, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985). Applying this test to the present case, it is readily apparent that the Cohen standard is not met because, for one thing, the question of whether the County may be held liable for the Sheriff's law enforcement actions is reviewable on appeal from a final judgment. In reaching this conclusion, we reject the County Commission's attempt to recast the third component of the Cohen test as an inquiry into whether the Commission's " 'right' to forego litigation" has been denied. Such a formulation would effectively eviscerate the Cohen test, because many of the erroneous legal rulings of a district court would constitute a denial of a party's "right" to forego litigation, thereby entitling that party to take an interlocutory appeal. The Cohen Court could not have intended such a result.
 
 
 81
 b. Pendent Party Appellate Jurisdiction
 
 
 82
 There is no pendent party appellate jurisdiction. Swint v. Chambers County Comm'n, --- U.S. ----, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995).
 
 C. THE CITY'S APPEAL
 1. The Federal Claims
 
 83
 The City seeks review of the denial of its summary judgment motion on the federal civil rights claims. The City's argument parallels the County Commission's: Chief Morgan was not the final decisionmaker for City law enforcement authority because the "City defendants had no authority" over the conduct of the two raids. The focus, however, is not on whether Chief Morgan exercised authority over the conduct of the raid, but rather on whether his participation in the raids, by virtue of his position and authority within the City, put the City's imprimatur on the unconstitutional conduct.
 
 
 84
 The district court did not expressly decide the issue of whether Chief Morgan exercised final policymaking authority in the law enforcement area for the City. The court noted only that the City could "be held liable on Counts I and II ... for Chief Morgan's decision to participate in the allegedly illegal raids of the Capri Club under Section 1983 if Chief Morgan is the final policy-maker for the City in the area of law enforcement" (emphasis added). However, the court declined to grant the City summary judgment "without some assertion that the Plaintiffs cannot prove that Chief Morgan was the final policy-maker in this area."
 
 
 85
 The City's appeal of the district court's action does not meet the requirements of the Cohen collateral order test, because the order does not conclusively determine the disputed question, and the issue is not unreviewable after final judgment. There is no pendent party appellate jurisdiction. Swint, --- U.S. ----, 115 S.Ct. 1203.
 
 2. The State Law Claims
 
 86
 In the aftermath of the district court's orders, the status of the state law claims is as follows:
 
 
 87
 1. Against Chambers County Commission: no surviving state law claims.
 
 
 88
 2. Against Sheriff Morgan: no surviving state law claims.
 
 
 89
 3. Against the City of Wadley: Count III (assault only) and Count IV (negligence) relating to the March, 1991, raid are the only surviving state law claims.
 
 
 90
 4. Against Chief Morgan: Count III (assault and false imprisonment) and Count IV (negligence) are surviving state law claims.
 
 
 91
 5. Against Officer Dendinger: Count III (assault and false imprisonment) is the only surviving state law claim.
 
 
 92
 The City, joined by Chief Morgan and Officer Dendinger, urge this Court to exercise pendent appellate jurisdiction over the district court's denial of summary judgment on these state law claims. As to the City, we lack the power to exercise any pendent jurisdiction, because we have no interlocutory jurisdiction over any claim against the City. See Swint, --- U.S. ----, 115 S.Ct. 1203. As to Chief Morgan and Officer Dendinger, even assuming that we do have discretionary pendent issue jurisdiction, see Swint, --- U.S. at ----, 115 S.Ct. at 1212, we decline to exercise it. Both of those parties against whom state claims survive must proceed to trial on the federal claims anyway. This trial will necessarily include presentation of evidence bearing directly on the state as well as the federal claims. Therefore, judicial economy concerns are not sufficiently implicated to justify use of pendent issue jurisdiction, if it exists. In reaching this conclusion, of course, we intimate no view as to the merits of these claims.
 
 III. CONCLUSION
 
 93
 As to the district court's order denying the qualified immunity summary judgment motions of Sheriff Morgan, Chief Morgan, and Officer Dendinger: we AFFIRM that denial insofar as the Fourth Amendment claims against all of the individual defendants and the equal protection claims against Officer Dendinger and Chief Morgan are concerned; and, we REVERSE that denial insofar as the due process claims against the three individual defendants for monetary damages and the equal protection claims against Sheriff Morgan are concerned.
 
 
 94
 We lack jurisdiction over the denial of the Chambers County Commission's motion for summary judgment and the denial of the City's motion for summary judgment. Our decision here is not meant to foreclose further development of the facts and consideration by the district court of whether Chief Morgan was the final law enforcement decisionmaker for the City at the time of the raids.
 
 
 95
 We also decline to exercise jurisdiction, assuming that we have it, over the appeals of Chief Morgan and Officer Dendinger from the district court's denial of summary judgment to those defendants on the pendent state law claims.
 
 
 96
 Accordingly, we AFFIRM in part, REVERSE in part, and REMAND this case for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 No majority opinion was issued by the panel in Adams. Two of the panel members did concur in the judgment affirming the denial of summary judgment on qualified immunity grounds. Judge Edmondson dissented. The en banc court reversed, "[o]n reasoning set out in the dissenting opinion of Judge Edmondson." Adams v. St. Lucie County Sheriff's Dep't, 998 F.2d 923 (11th Cir.1993) (en banc)
 
 
 [2]
 In the introduction to their complaint, plaintiffs refer to a violation of their rights guaranteed under the Thirteenth Amendment. However, plaintiffs indicated in a pretrial conference that they would not pursue the Thirteenth Amendment claim; the district court, therefore, regarded this claim as abandoned and declined to address it. So do we