**Cherry L. BREWER, et al., Plaintiff,**

**v.**

**CITY OF DAPHNE, et al., Defendants.**

**No. Civ.A. 97–0159–S.**

United States District Court,
S.D. Alabama,
Southern Division.

Jan. 28, 1999.

*MEMORANDUM OPINION
AND ORDER*

STEELE, United States Magistrate Judge.

In this prison suicide case, Plaintiff asserts claims against all defendants pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and Alabama Code § 6–5–410.[1] The action presently is before the Court on Defendants' Motion for Summary Judgment (Doc. 25), Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 32), Defendants' Reply to Plaintiff's Brief in Opposition (Doc. 35),

Defendants' Motion to Strike (Doc. 36), Plaintiff's Response to the Motion to Strike (Doc. 39), and Defendants' Reply to Plaintiff's Response to the Motion to Strike (Doc. 40). The undersigned has jurisdiction over this action pursuant to 28 U.S.C. § 636(c). Upon consideration of the pleadings, briefs and evidentiary submissions, this Court concludes that the Defendants' Motion for Summary Judgment is due to be granted with regard to Plaintiff's federal claims, and, with regard to Plaintiff's state law wrongful death claim, the Court declines to exercise supplemental jurisdiction.

I. OVERVIEW OF THIS LITIGATION

This action is brought by the mother of the deceased, Brian Scott Hobbs (hereinafter "Hobbs"). On May 1, 1995, after his conviction in the Daphne Municipal Court, Hobbs was admitted to the Daphne City Jail to serve an eighteen-month sentence for driving under the influence and speeding. On June 30, 1995, more than a month into his sentence and while on work release at the Daphne Animal Shelter, the results of an intoxilyzer test revealed Hobbs had a blood alcohol content of .130%. Hobbs was found dead in his cell later that day. Medical records indicate that he died as a result of suicide from asphyxiation caused by hanging.

The Defendants in this lawsuit are the City of Daphne, Alabama; Harry Brown, Mayor of Daphne, Alabama; and Joseph Hall, the Chief of Police for the City of Daphne, Alabama. Defendants Brown and Hall are sued in their individual capacities only.[2] In Count I of the complaint, plaintiff seeks relief pursuant to 42 U.S.C. § 1983 for alleged violations of Hobbs' Fifth, Eighth and Fourteenth Amendment rights. Plaintiff contends that the Defendants acted with "deliberate and callous

---

1. Ala.Code § 6–5–410 is the state's wrongful death statute. Plaintiff is the personal representative of the deceased's estate and is suing on grounds thereon.

2. *See* Pl.'s Br. in Opp'n. to Defs.' Mot. for Summ.J. (Doc. 32).

indifference to the serious medical needs of Brian Scott Hobbs" when the decedent was left "unattended without necessary and appropriate medical or mental health measures required to protect him from [his] suicidal propensities." Compl. ¶¶ 12, 16. In Count II of the complaint, Plaintiff complains that Hobbs' death is the result of Defendants' policy, custom, supervisory authority, and ratification of the "unconstitutional conduct of offending employees" and their failure to train, "investigate and punish or reprimand those responsible for unconstitutional conduct...." Compl. ¶ 20. Plaintiff avers that said failures "demonstrate a policy and custom of deliberate indifference." *Id.*

Counts III and IV of the complaint state a claim for relief under Alabama's wrongful death statute. Plaintiff seeks to recover money damages under Alabama law for Hobbs' pain and suffering, which allegedly resulted from the wantonness and negligence of the Defendants in caring for inmate Hobbs. Additionally, in Count IV of the complaint, Plaintiff makes a claim for relief pursuant to 42 U.S.C. §§ 1985 and 1986. Furthermore, Plaintiff seeks both declaratory and injunctive relief.[3]

## II. PROCEDURAL BACKGROUND

### A. *Jurisdiction*

Title 28 U.S.C. § 1331 vests the court with federal question jurisdiction over Plaintiff's claim for relief pursuant to 42 U.S.C. §§ 1983, 1985 and 1986. The Court has supplemental jurisdiction over Plaintiff's state law claims by way of 28 U.S.C. § 1367(a).

### B. *Summary Judgment Standards*

Summary judgment is proper under Fed.R.Civ.P. 56(c)

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, ..., against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2553; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the [d]istrict [c]ourt—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. While the Court is to view the evidence produced and all factual inferences rising from it in a light most favorable to the nonmoving parties, *Barfield v. Brierton,* 883 F.2d 923, 934 (11th Cir.1989), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact.*" *Anderson v. Liberty Lobby, Inc.,*

---

**3.** Based upon the conclusions of law discussed herein, Plaintiff's claims for injunctive and declaratory relief, which the Court concludes are broad, over-reaching and unsubstantiated by the evidence in the record, are moot. *See McKinnon v. Talladega County,* 745 F.2d 1360, 1363 (11th Cir.1984).

477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

If the nonmoving party's "response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor." *Barfield,* 883 F.2d at 934. A fact is material when it is identified by the controlling substantive law as an essential element of the nonmoving party's case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249–50, 106 S.Ct. at 2511. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence so as to create a genuine issue for trial.

The Eleventh Circuit has explained that, [f]acts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." [Citations omitted]. Thus, under such circumstances, the public official is entitled to summary judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial. *Bennett v. Parker,* 898 F.2d 1530, 1532 (11th Cir.1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1085 (1991).

After reviewing Defendants' summary judgment motion, and in consideration of Plaintiff's legally insufficient opposition thereto, the undersigned is of the opinion that summary judgment on Plaintiff's federal claims should be granted in favor of Defendants. Plaintiff has failed to show that "there [is] a substantial conflict in evidence to support a jury question" on the issue. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997), *quoting Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989). With regard to Plaintiff's state law wrongful death claim, the Court declines to exercise its supplemental jurisdiction.

In granting the Defendants' motion for summary judgment on Plaintiff's federal claims and in declining to assert supplemental jurisdiction over Plaintiff's state law wrongful death claim, the Court makes the following findings of fact and conclusions of law.

### III. FINDINGS OF FACT [4]

■ When the record is examined as a whole, not meted out in sound bites, it

---

**4.** Pursuant to Federal Rule of Civil Procedure 12(f), Defendants have filed a Motion to Strike (Doc. 36) "certain alleged evidence" and statements made by Plaintiff in her brief in opposition to Defendants' motion for summary judgment. Specifically, Defendants take issue with (1) Plaintiff's references to conversations between the decedent Hobbs and Plaintiff prior to his suicide; (2) narrative information provided on Hobbs' "early life" before his arrest and subsequent incarceration for DUI; (3) unsworn statements by inmates at the Daphne City Jail taken during an ABI investigation of Hobbs' death, submitted as Exhibit "K" to Plaintiff's brief in opposition; and (4) the testimony of Plaintiff's experts on how Hobbs' suicide could have been prevented.

Rule 56(e) of the Federal Rules of Civil Procedure provides that:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party

does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Consequently, entry of summary judgment is mandated, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Moreover, a nonmoving party cannot use inadmissable hearsay to defeat summary judgment when that hearsay will not be reducible to an admissible form at trial. *See Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir.1996); *see also McMillian v. Johnson*, 88 F.3d 1573, 1583–84 (11th Cir.1996), *reversed on other grounds*, 101 F.3d 1363 (11th Cir.1996) (en banc).

At the outset the Court notes that, for the reasons discussed herein, Plaintiff has failed to prove an essential element of her federal claims. Thus, the Defendants are entitled to summary judgment on those claims on that basis alone. However, the Court will address the hearsay issues raised by Defendants motion to strike.

After an extensive review of materials at issue, it is clear from the record that there is nothing to indicate that Plaintiff's statements, in her brief in opposition and in the testimony given at her deposition, as to any conversations she may have had with the deceased prior to his death, will lead to admissible evidence or that such evidence is relevant to the issues before the Court. On the contrary, Plaintiff's statements as to whether inmates are allowed to "smoke pot" or whether a person named "Doris" informed the decedent the day of his death that he was due to be transferred to Birmingham were refuted by the Defendants' evidence (e.g., the affidavits of Hall, Rivero, Sledge, and Brown) which can be reduced to admissible forms at trial. *See Pritchard*, 92 F.3d at 1135; *see also United States v. Cruz*, 765 F.2d 1020 (11th Cir. 1985) (statements not made contemporaneously with the observations of the declarant are not covered by the exception to the hearsay rule). Thus, Plaintiff's statements to Hobbs or Hobbs' statements to Plaintiff present no evidence that can either be reduced to an admissible form at trial or which can establish an essential element of the Plaintiff's constitutional claims; specifically, whether Defendants were deliberately indifferent to Hobbs' serious medical need and, if so, whether that indifference proximately caused his suicide. As such, the Court concludes that any proffered evidence of Plaintiff's conversations with Hobbs while incarcerated at the Daphne Jail are immaterial to the legal issues presented, constitute inadmissible hearsay that cannot be reduced to an admissible

form at trial, and are due to be, and are hereby STRICKEN from the record.

Defendants also argue that the statements contained in Plaintiff's Exhibit "K" should be struck as constituting inadmissible hearsay under Federal Rule of Evidence 802 and for failing to comply with Fed.R.Civ.P. 56(e). *Plaintiff's Exhibit "K" contains unsworn* statements made by inmates and jailors concerning Hobbs' suicide. The statements were made to an ABI investigator during a routine investigation several days after Hobbs' death. Plaintiff argues that the statements of the inmates are admissible under Fed.R.Evid. 803(6) and Fed.R.Evid. 803(8) as records of regularly conducted activity and as public records and reports. Further, Plaintiff contends that Hobbs' statements to these inmates as reported in Exhibit "K" are admissible as excited utterances and state of mind exceptions to hearsay. Plaintiff does not dispute that the statements given by these inmates are unsworn. *See* Fed.R.Civ.P. 56(e) ("[t]he court may permit affidavits to be supplemented *or opposed* by depositions, answers to interrogatories, or further affidavits. *An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.*") (emphasis added). Therefore, on their face, the statements do not meet the requirements of Rule 56(e).

Additionally, Plaintiff fails to convince the Court that, because the statements were made pursuant to a regularly conducted activity, they fall outside the general prohibition against hearsay and are admissible under the business records exception. While it is true that the investigating officer was acting within the "ordinary course of business" for the Alabama Bureau of Investigation, it does not follow that the inmates in making their statements were so acting. *See* Fed.R.Evid. 803(6) advisory committee's note. ("[i]f, however, the supplier of the information does not act in the regular course [of business], an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail."); *see also Toole v. McClintock*, 999 F.2d 1430, 1434 (11th Cir. 1993) (Fed.R.Evid. 803 makes admissible only the hearsay statements "of public offices or agencies," not the findings of others which the government investigator may have considered or cited). Thus, the statements lack the trustworthiness contemplated to constitute routine business activity and are simply hearsay. As such, they are due to be struck.

reveals that the facts pertinent to Defendants' motion for summary judgment are undisputed by the parties, despite Plaintiff's questionable attempts to create questions of fact where there are none. Nonetheless, as a threshold matter, in considering a motion for summary judgment the Court "view[s] the evidence and all inferences arising therefrom in the light most favorable to the nonmoving party." *Young v. City of Augusta*, 59 F.3d 1160, 1163, n. 4 (11th Cir.1995). Thus, to the extent that there is any discrepancy in the record, the Court views the evidence in the light most favorable to the plaintiff, the nonmovant.

### A. Background to the Suicide

On March 13, 1995, Daphne Police Officer Ken Weed stopped Hobbs for speeding on Highway 98 in Daphne.[5] While talking with Hobbs, Officer Weed detected an odor of alcohol and thereafter requested that Hobbs demonstrate several field sobriety tests.[6] Hobbs failed each test.[7] Hobbs was arrested, given a blood alcohol content test, and charged with driving under the influence after the test revealed an alcohol blood content at a level of .160%.[8] Officer Weed transported Hobbs to the Daphne City Jail in Daphne, Alabama.[9] While being admitted to the jail, Hobbs was required to complete the jail's standard admission intake forms.[10] When Hobbs filled out the forms, he indicated by checking the appropriate boxes that he had never been treated for mental illness and had never attempted suicide, although Hobbs did admit that he had been treated for drug and alcohol addiction from 1988–1989.[11]

The next day, on March 14, 1995, Hobbs made bail and was released from the jail.[12] After a hearing on the DUI charges,

---

Alternatively, the Plaintiff argues that the statements fall within the public records exception to hearsay. The Court disagrees. "Justification for the exception [in Fed. R.Evid. 803(8) ] is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed. R.Evid. 803(8) advisory committee's notes. Consequently, to be admissible as a public record, all statements in the ABI report must have been prepared by a public official, which they clearly were not. In any event, in *United States v. Cain*, 615 F.2d 380, 382 (5th Cir. 1980), the Court held that "statements inadmissible as public agency reports under Fed. R.Evid. 803(8) may not be received merely because they satisfy Fed.R.Evid. 803(6) and that section (6) does not open a back door for evidence excluded by section (8)." Accordingly, these statements are not admissible under Fed.R.Evid. 803(6) or Fed.R.Evid. 803(8) and are hereby STRICKEN from the record as hearsay not excepted by the rules.

While the deposition testimony of Plaintiff outlining alleged prior suicide threats made by her decedent and his past treatment for alcohol abuse is not so prejudicial as to outweigh its probative value, the Court finds that the testimony is, nonetheless, immaterial as a matter of law. *See Edwards*, 867 F.2d at 1275 ( [i]n the absence [of knowledge] of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference); *see also Williams v. Lee County*, 78 F.3d 491 (11th Cir.1996). As such, said testimony is hereby STRICKEN.

The Defendants' motion to strike the Plaintiff's expert testimony is DENIED. However, as discussed below, because the Court is inclined to grant Defendants' motion for summary judgment on all of the Plaintiff's federal claims, the expert testimony is deemed insufficient as a matter of law for Plaintiff to establish the deliberate indifference element of her claims. *See Edwards*, 867 F.2d at 1275.

**5.** *See* Pl.'s Ex. "A" (Arrest Report of Scott Hobbs).

**6.** *Id.*

**7.** *Id.*

**8.** *See* Doc. 32 at p. 6 (Pl.'s Br. in Opp'n.).

**9.** *Id.*

**10.** *See* Pl.'s Exs. "B" and "C" (Admission Data–Jail Inmate's Medical Record).

**11.** *See* Pl.'s Ex. "B" where Jailor noted that Hobbs displayed no despondent or suicidal tendencies and that Hobbs had been arrested before in Birmingham for DUI.

**12.** *See* Doc. 32 at p. 6 (Pl.'s Br. in Opp'n.).

Hobbs was convicted in the Daphne Municipal Court and sentenced to serve eighteen (18) months in the Daphne City Jail.[13] Hobbs began serving his sentence May 1, 1995.[14]

By all accounts, prior to his suicide on June 30, 1995, Hobbs was a model prisoner who enjoyed trustee status and worked in the City's animal control shelter up until the very day of his death.[15] On the day of Hobbs' suicide, at around 4:00 p.m., Defendant Hall personally went by the shelter to pick up Hobbs and another trustee who had worked at the shelter that day.[16] Since Hobbs appeared to be intoxicated, he was transported back to the jail.[17] As part of the Chief's policy on returning trustees from work release duties, Hobbs was frisked for contraband when he returned to the jail, and none was found.[18] Defendants assert that Hobbs did not appear suicidal.[19] Hobbs was then given an intoxilyzer test at the request of Defendant Hall.[20] Hobbs tested .13, which is over the legal limit for driving.[21] Hobbs' status as a trustee was then revoked and he was placed in his cell.[22]

Shortly thereafter, Defendant Hall left the station for home.[23] Approximately forty-five (45) minutes later, Hall spoke with one of the jailors at the station.[24] The jailor informed Hall that he had received complaints from the other inmates that Hobbs was threatening them.[25] Hall instructed the jailor to move Hobbs to the center cell where he could be watched more closely, and to remove any of Hobbs' personal effects with which he could use to hurt himself or the other inmates.[26]

However, unbeknownst to Hall at the time he ordered that Hobbs be moved to the center cell, one of the jailors discovered a noose made out of sheets while in the process of moving Hobbs from the left cell.[27] Neither jailor Sledge nor Rivero reported the finding to Defendant Hall until after Hobbs' suicide.[28] The center

13. *Id.*

14. *Id.*

15. Hall Aff. ¶ 6.

16. *Id.*

17. According to Defendant Hall, prior to June 30, 1995, none of the trustees who worked outside the jail had ever returned to the jail intoxicated and any inmate on trustee status who became intoxicated or under the influence of drugs while on work release would have his privileges as a trustee revoked. Hall Aff. ¶ 6. At no time prior to June 30, 1995, did Hobbs give Hall any reason to revoke his trustee status. *Id.* Hall does not know how Hobbs was able to get access to alcohol at the shelter, since officers in the department monitored Hobbs and the other inmates at the shelter at least hourly. Hall Aff. ¶ 8.

18. Hall Aff. ¶ 6.

19. Hall Aff. ¶ 9; Rivero Aff. ¶ 6.

20. *Id.; Id.* at ¶ 3.

21. Hall Aff. ¶ 9.

22. *Id.*

23. *Id.*

24. The Court notes that in jailor Sledge's Affidavit (¶ 5), Sledge recalls receiving a call from Hall and in Hall's Affidavit (¶ 10), Hall recalls receiving a call from one of the jailors, either Sledge or Rivero. Jailor Rivero recalls that Hall called the station to check on Hobbs. Rivero Aff. ¶ 5. In any case, the Court will assume that Hall spoke with one of the jailors, probably Sledge, approximately forty-five (45) minutes after he left the jail.

25. Hall Aff. ¶ 9; Sledge Aff. ¶ 5.

26. *Id.; see also* Hall Dep. at 23; Rivero Aff. ¶ 5; Sledge Aff. ¶ 5.

27. Sledge Dep. at 111; Sledge Aff. ¶ 6; Rivero Aff. ¶ 6.

28. Hall Aff. ¶ 12. Both Jailors Sledge and Rivero spoke with the decedent after the makeshift noose was found and each separately concluded that nothing in Hobbs' demeanor led him/her to believe that Hobbs was depressed, withdrawn, delusional or seriously considered suicide. Rivero Aff. ¶ 6; Sledge Aff ¶ 7. Furthermore, Jailor Sledge questioned Hobbs about the noose and made a determination based on his experience and training on identifying potentially suicidal inmates that "[n]either his words nor his actions indi-

cell contained only bunk beds, a mattress and a toilet.[29] Jailors Sledge and Rivero periodically checked on Hobbs and spoke to him while he was in the center cell.[30] Approximately fifteen (15) minutes before Hobbs was found hanged in his cell, one of the jailors checked on him.[31] At that time, Hobbs was lying on the bottom bunk bed and appeared to be sleeping.[32] A short time later, an inmate informed the jailors that Hobbs had committed suicide.[33] An ambulance was immediately called by the dispatcher.[34] In the interim, two officers who had been trained in the use of CPR began performing CPR on Hobbs until the paramedics arrived.[35] The paramedics took Hobbs to Thomas Hospital where he was later pronounced dead.[36]

Defendant Hall received a call at approximately 9:34 p.m., at which time he was informed by the dispatcher that Hobbs had hanged himself in the center cell.[37] Hall then went to the jail to make sure the scene was secure and that the supervisors had called the Alabama Bureau of Investigation ("ABI").[38] Hall subsequently informed Defendant Brown of Hobbs' apparent suicide.[39] Defendant Mayor Brown did not know Hobbs personally, nor was he aware that Hobbs had been admitted to the Daphne City Jail until after Hobbs' death.[40]

### B. *Miscellaneous Background Information*

Defendant Hall, as Chief of Police for the Daphne City Jail, is responsible for implementing the policies and procedures for jail operations at the Daphne Jail.[41] He serves under the supervision of Defendant Brown, Mayor of Daphne, Alabama.[42] On June 30, 1995, the suicide policy at the jail "was to monitor closely any person that exhibited signs of being a suicide risk and to take away anything with which that person might harm himself."[43] As part and parcel of jail operation policy, Defendant Hall required all officers under his command to attend college courses and complete in-house training on all aspects of their correctional duties.[44] Suicide prevention is covered in the 80-hour course jailors are required to attend at a local college.[45] In addition, materials on suicide prevention published by the University of Alabama and two training keys are a required part of the field officers' in-house training at the jail.[46] Both jailors on duty the night of Hobbs' suicide, Carolyn Rivero and Larry Sledge, had been trained in-

---

cated to [him] that he was thinking about taking his life." Sledge Aff. ¶ 7.

29. Rivero Aff. ¶ 4; Hall Aff. ¶ 8. Additionally, Hobbs was stripped of his shoes.laces, not given bed linens or bath towels, and was only allowed to keep his shoes, short-sleeved shirt, socks, and underwear. *Id.* at ¶ 5; *Id.* at ¶ 10; *see also* Sledge Aff. ¶ 5.

30. Sledge Aff. ¶ 7; Rivero Aff. ¶ 6.

31. Sledge Aff. ¶ 8.

32. *Id.*

33. *Id.*

34. *Id.*

35. *Id.*

36. *Id.; see also* Doc. 25 at ¶ 8 ("Findings of Fact").

37. Hall Aff. ¶ 11.

38. *Id.;* The ABI conducted an investigation into Hobbs' death, and the report was submitted to a Baldwin County Grand Jury; no further action was taken. *Id.*

39. Brown Aff. ¶ 6.

40. *Id.*

41. Hall Aff. ¶ 2; Brown Aff. ¶¶ 3–5.

42. *Id.; Id.*

43. Hall Aff. ¶ 2.

44. *Id.* at ¶ 3.

45. *Id.*

46. *Id.; see also* Exhibits "A" ("Suicide Program") and "B" ("Training Keys") to Hall Affidavit. Both Plaintiff and Defendants refer to the training keys in Defendants' Exhibit "B." The training keys provide information for assessing and managing the suicide risk of inmates.

house with the suicide prevention materials prepared by the University of Alabama and the training keys.[47] Neither Rivero nor Sledge are parties to this action.

Hobbs was only the second inmate to commit suicide at the Daphne City Jail.[48] The first inmate was Tony Smith, who hanged himself by his shirt in April 1994.[49] After the Smith suicide, at Defendant Hall's request, Baldwin County Mental Health conducted additional training on suicide prevention for the employees of the police department and the jail, and the two training keys on suicide prevention were added to in-house field training of department employees.[50] Plaintiff has engaged expert witnesses on the matter, one of whom is described as an "expert in suicidiology" and who is a professor at the University of Alabama.[51] Plaintiff's experts argue that "an inmate in Scott Hobbs' condition should [have been] in open view of jail personnel at all times ..." and that "if the Training Keys had been followed, Hobbs would have been still alive and with us today." [52]

## IV. CONCLUSIONS OF LAW

▉▉▉ In order to state a claim under 42 U.S.C. § 1983, a plaintiff must establish

47. Hall Aff. ¶ 3.

48. *Id.* at ¶ 4.

49. *Id.*

50. *Id.* The Court notes that Plaintiff argues in her brief in opposition that no changes were made after Smith's suicide. However, Plaintiff's arguments are conclusory and unsupported by the evidence.

51. Pl.'s Br. in Opp'n. at 21–24.

52. *Id.* at 25 (internal quotes omitted). Plaintiff argues further that in the opinion of her experts, "[t]here should have been no doubt that Hobbs needed to be on suicidal precautions. The single most contributing factor to suicide among inmates (and others) is alcoholism and drug abuse. Moreover, drug abuse is a psychiatric problem." *Id.* (Internal quotes and cites omitted).

Moreover, Plaintiff insists, the jail's screening procedures were inadequate and

that: "(1) ... the conduct complained of was committed by a person acting under color of state law; and (2) ... this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986). Additionally, a plaintiff must causally connect a defendant's actions, omissions, customs, policies, or breaches of statutory duty to a deprivation of the plaintiff's constitutional or federal rights in order to state a claim under § 1983. *See Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir.1986); *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Moreover, a supervisor in a § 1983 action may be liable only if he participated in the wrongful act or there is a causal connection between a supervisor's act and the alleged deprivation. *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1560–61 (11th Cir.1993), *modified*, 14 F.3d 583 (11th Cir.1994).

### A. *Plaintiff's Federal Claims*[53]

▉▉▉ "[D]eliberate indifference to serious medical needs of prisoners constitutes

contributed to Hobbs' suicide, and had the Defendants taken proper note that Hobbs had undergone past treatment for alcohol and drug abuse, Hobbs could have received proper care for his addictions or "predisposing factors" to suicide. *Id.* at 21–23. Plaintiff's expert, Dr. Miller, testified that a "drunk inmate with an extensive history of belligerent and/or criminal behavior should be enough of a warning sign to take suicide prevention measures in a situation like the one in the instant case." Id. at 26.

53. The Court notes that although the Plaintiff has alleged violations of her decedent's Fifth, Fourteenth and Eighth Amendment rights pursuant to 42 U.S.C. § 1983, to the extent that her claims fall under substantive due process clauses of the Fifth and Fourteenth Amendments, they are subsumed under the Eighth Amendment as a matter of law. *See Edwards v. Gilbert*, 867 F.2d 1271, 1275–76 (11th Cir.1989) (Substantive due process clause provides no greater protection than that afforded by the Eighth Amendment).

the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). The deliberate indifference standard also applies to inmates' psychiatric and psychological needs, including the proclivity for inflicting injury or death upon himself. *See Belcher v. City of Foley,* 30 F.3d 1390, 1396 (11th Cir.1994) (*citing Estelle,* 429 U.S. at 103, 97 S.Ct. at 290; *Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996) [54]; *Harris v. Thigpen,* 941 F.2d 1495, 1504 (11th Cir.1991); *Greason v. Kemp,* 891 F.2d 829, 834 (11th Cir. 1990) [55]; *Waldrop v. Evans,* 871 F.2d 1030, 1033 (11th Cir.1989); [56] *see also Hardin v. Hayes,* 957 F.2d 845, 849 (11th Cir.1992)).[57]

■ In order to prevail on such a claim, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.

However, "[n]either 'inadvertent failure to provide adequate medical care' nor a physician's 'negligen[ce]' in diagnosing or treating a medical condition' states a 'valid claim of medical mistreatment under the Eighth Amendment.'" *Hill v. Dekalb Regional Youth Detention Center,* 40 F.3d 1176, 1186 (11th Cir.1994) (*quoting Estelle,* 429 U.S. at 105, 106, 97 S.Ct. at 292).

■ An analysis of a claim of deliberate indifference to serious medical needs has two components: "[W]hether evidence of a serious medical need exists; [and] if so, whether the defendants' response to that need amounted to deliberate indifference," one is objective and the other subjective. *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir.1995). The United States Supreme Court characterizes serious medical needs impacting on constitutional rights as those "rang[ing] from 'the worst cases,' producing 'physical torture or a lingering death,' to 'less serious cases,' resulting from the 'denial of medical care,' which could cause 'pain and suffering.'" *Hill,* 40 F.3d at 1186 (*quoting Estelle,* 429 U.S. at 103, 97 S.Ct. at 290).[58] Thus, first, the Plaintiff must

---

**54.** In *Steele,* an inmate who had been a potential suicide victim had his psychiatric medications (Prozac and Tofranil) discontinued for 182 days. As a result he suffered from insomnia, anxiety, and various bodily pains. The inmate had been dependent on cocaine, had a history of suicide attempts, and was re-classified as a suicide risk. *Id.* 87 F.3d at 1267.

**55.** In *Greason,* an inmate with a history of mental illness (a schizophrenic with suicidal tendencies) had his medication discontinued following a brief encounter with the psychiatrist who determined that Greason's condition had stabilized. As a result thereof, Greason reported that he was unable to sleep and had thoughts of despair and suicide. He unsuccessfully attempted to kill himself. Subsequently, Greason was not placed on a suicide watch and hung himself from his cell bars with his sweatshirt. *Id.* 891 F.2d at 831–34.

**56.** In *Waldrop,* the inmate plead guilty but mentally ill to armed robbery, was sentenced, and was confined at the Georgia Diagnostic and Classification Center. There, Waldrop's medications, Lithium and Haldol, used to control his previously diagnosed manic depression, were discontinued. Thereafter, Waldrop deteriorated rapidly, suffering with

nightmares and insomnia. During a two-month period, Waldrop slashed his forearm—an injury requiring stitches; he gouged out his left eye which required emergency surgery; he used a razor blade to cut his scrotum—losing both testicles; and while under restraint, he reached his right eye and damaged it so severely that he lost his sight. *Id.* 871 F.2d at 1031.

**57.** In *Hardin,* while confined at a county jail, the inmate beat her forehead against the bars of her cell, grabbed a ballpoint pen from a jail matron and stabbed the matron in the hand and then stabbed herself. A day later, she flooded her cell and paced in the standing water with excrement on the floor. Subsequently, she was found unconscious in her cell. Attempts to resuscitate her were unsuccessful. An autopsy determined that the cause of death was asphyxia due to a small bar of soap lodged in the her hypopharynx; a bar of soap was also found in her stomach. *Id.* 957 F.2d at 847.

**58.** The Eleventh Circuit has enumerated various ailments and maladies which constitute serious medical needs. *See Adams,* 61 F.3d at 1543 (inmate suffering with chronic asthma died of an acute asthma attack following the

prove that the alleged deprivation was objectively serious. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1976–77, 128 L.Ed.2d 811 (1994). "For a claim ... based on a failure to prevent harm, [Plaintiff] must show that [the inmate] [was] incarcerated under conditions posing a substantial risk of serious harm." *Id.*, 511 U.S. at 834, 114 S.Ct. at 1976.

Second, the subjective component of the analysis requires proof of deliberate indifference to inmate safety or health. *Id.*, 511 U.S. at 834, 114 S.Ct. at 1977. "The deliberate indifference standard is met only if there is 'a strong likelihood, rather than a mere possibility,' that self-infliction of harm would result." *Hardin*, 957 F.2d at 850–51 (*citing Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir.1989)). Mere negligence does not rise to the level of deliberate indifference. *Farmer*, 511 U.S. at 835, 114 S.Ct. at 1978. Moreover, in prison-condition cases like this one, the Supreme Court has consistently held that a "prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Vinson v. Clarke County*, 10 F.Supp.2d 1282, 1294 (S.D.Ala.1998) (*quoting Farmer*, 511 U.S. at 847, 114 S.Ct. at 1984).

Third, because the Plaintiff has asserted an Eighth Amendment claim against the City of Daphne, a municipality, there is no subjective component of the deliberate indifference analysis as the term applies to this particular defendant, as it is not possible for a municipality to have subjective intentions. *Id.* at 1294. Instead, " 'delib-

erate indifference' must be measured under an objective approach that does not account for actual disregard of known risks." *Id.* at 1294 (*quoting Farmer*, 511 U.S. at 841, 114 S.Ct. at 1981). Thus, the inquiry then turns on "whether there were substantial risks present which were 'so obvious' that the municipality 'can reasonably be said to have been deliberately indifferent to the need.' " *Id.* at 1294 (*quoting City of Canton v. Harris*, 489 U.S. 378, 396, 109 S.Ct. 1197, 1208–09, 103 L.Ed.2d 412 (1989)).

### B. Specific Claims

1. Plaintiff alleges in Count One of her complaint that Defendants were deliberately indifferent to the deceased's serious medical and mental health care needs by failing to protect him from self-inflicted harm and leaving him unattended while incarcerated in the Daphne City Jail.[59]

### a. The Liability of the Individual Defendants

■ Both Defendant Hall and Brown are supervisory officials for the City of Daphne. Defendant Brown had no direct contact with Mr. Hobbs and did not learn of his existence until after his death. Defendant Hall had direct contact with Hobbs on the day of his death but was not aware of any suicidal tendencies or mental health needs he may have had until after his death. The Plaintiff seeks to hold both Defendants liable for failing to provide adequate psychological care to the deceased prior to his death and for failing to protect him from self-inflicted harm given his intoxicated state on the day of his death. The Defendants have asserted a defense of qualified immunity in this case.

discontinuation of his medication); *see also Hill*, 40 F.3d at 1187, n. 21. The note in *Hill*, describes the following conditions as constitutionally "serious": "a serious and painful broken foot;" [an] automobile accident where the individual was "in obvious need of immediate medical attention because of his medically emergent and deteriorating ... condition;" a "three-day delay in medical treatment for shoulder injury;" death resulting from leukemia after a four-month deprivation of medi-

cal treatment; a broken neck; a gash over a detainee's eye which bled for two hours prior to suturing; and shock and extensive internal bleeding resulting from gunshot wound.

59. To the extent that Plaintiff relies on expert testimony to substantiate her claim for inadequate psychological care, her reliance is misplaced. However, her arguments will be briefly addressed in the Court's discussion of Count Two of the Plaintiff's complaint.

 The law is clearly established that jail officials may not act with deliberate indifference to the risk of inmate suicide. *Edwards,* 867 F.2d at 1274–75. However, unless there was a "strong likelihood, rather than a mere possibility, that suicide would result from a defendants's actions or inaction," there can be no deliberate indifference to an inmate's safety. *Tittle v. Jefferson County Comm'n,* 10 F.3d 1535, 1540 (11th Cir.1994) (en banc) (internal question marks and citations omitted). More importantly, "[s]upervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." *See Belcher,* 30 F.3d at 1397 (*quoting Hardin,* 957 F.2d at 849). Supervisors may, however, be held liable under § 1983 "when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990).

In Count One of the Plaintiff's complaint, Defendants' Eighth Amendment liability is predicated solely on an alleged failure to address Hobbs' alleged psychological need, which Plaintiff contends should have been apparent from his answers to questions posed on the "Admission–Data" forms he filled out the day of his arrest and subsequent conviction for DUI. As far as the Court can deduce from the pleadings, Plaintiff appears to seek redress in the first Count on the theory that, because Hobbs gave conflicting accounts as to whether he had a drinking problem, had ever attempted suicide, and had ever been treated for drug abuse, Defendants had a duty to inquire further into the discrepancy and, thus, provide adequate psychological counseling to Hobbs, and their failure to do so proximately caused his death. Therefore, the Court construes Court One as a claim for inadequate psychological care in violation of the rights guaranteed under the Eighth Amendment.

The analysis of this claim is two-fold: whether there is evidence of a serious medical need and if so, whether Defendants' response to that need amounted to deliberate indifference. *Adams,* 61 F.3d at 1543. The Eleventh has defined a serious medical need as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill,* 40 F.3d at 1187 (*quoting Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H. 1977)).

The evidence does not establish that a serious psychological need existed. Although Plaintiff refers often to Hobbs' admission data as being consistent with a dire need for psychological care, the evidence presented does not reflect that Hobbs either mentioned the existence of any psychological problems or made any other requests for psychological care during any one of his numerous encounters with jail personnel prior to June 30, 1995. Moreover, Plaintiff has not alleged that her decedent had ever been diagnosed as mentally ill or that his need for psychological care was "so obvious that even a lay person would recognize the need for a doctor's attention." *Id.* at 1187.

In fact, the evidence indicates that on both occasions in which Hobbs was admitted to the jail, he answered "no" to both written and oral questions asking whether he had ever attempted suicide or had a history of mental illness.[60] The evidence further reflects that once at the Daphne Jail, Hobbs made no request for psychological care to treat his alcohol addiction, nor did he express thoughts of suicide or appear despondent and depressed.[61]

---

**60.** See Pl.'s Evidence in Opp'n to Defs.' Mot. for Summ. J., Exs. "B" and "C" ("Admission Data—Jail Inmate's Medical Record").

**61.** Defendant Hall testified, without contradiction, that:

"if an inmate engaged in self mutilation, appeared to withdraw from the other inmates and the jailers, began crying over an extended period of time, or otherwise appeared to need mental health counseling, we would offer to call Baldwin County

Moreover, the evidence presented here does not reflect a serious psychological need comparative to the evidence presented in *Steele, Greason, Waldrop,* or *Hardin,* as discussed *supra.* The evidence does not indicate that Defendants could have known that Hobbs was in such dire need of psychological care, that if not addressed, Hobbs would harm himself. *See Hardin,* 957 F.2d at 851. As such, the evidence presented does not establish that, while Hobbs was confined at the jail, he suffered with a serious psychological need.

Moreover, even if Hobbs' psychological need could be deemed serious, the evidence establishes that Defendants were not deliberately indifferent. The undisputed evidence reflects that, because Hobbs had been extremely antagonistic toward other inmates, and because he was intoxicated, Chief Hall took adequate precautionary measures to insure Hobbs' safety and the safety of the other inmates by ordering that Hobbs be moved to a different cell and stripped of any item with which he could harm himself, including bed sheets and bath towels. Hobbs was left only with a short-sleeve shirt, jeans, socks, underwear, and boots sans the shoelaces.

He was monitored every fifteen to thirty minutes and was seen alive and resting just fifteen minutes prior to his death. These precautions were ordered by Defendant Hall even though Hobbs had previously enjoyed trustee status and had exhibited no signs prior to June 30, 1995, that would have led Defendant Hall to believe that Hobbs might injure or kill himself if he was not afforded psychological care. As noted by the Eleventh Circuit in *Edwards,* "[i]n the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation or any other court within this circuit that has concluded that official conduct in failing to prevent a suicide constitutes deliberate indifference." 867 F.2d at 1275 (citations omitted) (footnote omitted).[62] As such, Defendant Hall cannot be said to have been deliberately indifferent to Hobbs' serious medical needs, if any, merely because he failed to prevent Hobbs' suicide.

Moreover, Plaintiff has failed to establish a causal connection between any action or inaction on the part of Defendants Hall and Brown that proximately caused

Mental Health to consult with those inmates. Hobbs never exhibited any signs of needing mental health counseling. We also told all inmates, including Hobbs that we would transport them to Alcoholics Anonymous (AA). Hobbs never asked to go to AA. When the inmates wanted to attend those meetings, our police officers carried them in a city patrol car. If a person were admitted to the jail with known mental problems, we would monitor that person constantly until we could obtain a transfer of that inmate to the County jail, which is designed to handle mentally ill inmates." Hall Aff. ¶ 3. In addition, jailors Rivero and Sledge each testified that they had each seen Hobbs alive and calm fifteen to thirty minutes before his death and he "appeared to be a typically intoxicated person" (Sledge Aff. ¶ 7), who while initially "agitated and angry, . . . later calmed down and began acting more like his usual demeanor" (Rivero Aff. ¶ 6).

62. The Court notes that Plaintiff argues that the suicide of Tony Smith fifteen months prior to Hobbs' suicide should have put the Defendants on notice that changes needed to be made to their suicide prevention detection

procedures, but no extra precautions or training was implemented. Plaintiff directs the Court's attention to the deposition testimony of Defendant Hall wherein he allegedly admits as much. However, as the Court previously discussed, the Plaintiff has failed to provide the Court with a copy of said testimony, and the only evidence in the record pertaining to changes made after the death of Smith is the undisputed Affidavit of Defendant Hall that directly contradicts Plaintiff's assertions. Thus, the Court finds that Plaintiff's argument has no merit.

In any case, Plaintiff has adduced no evidence to show that any similarities between the two suicides exist. "Furthermore, the issue is deliberate indifference, vel non, as to this decedent and the knowledge, if any, of his proclivity; not that of some other inmate. The argument is tantamount to saying that since it is known that some inmates in some jails have committed suicide, they must all be constantly observed." *Popham v. City of Talladega,* 742 F.Supp. 1504, 1512 (N.D.Ala. 1989) (emphasis omitted), *aff'd by* 908 F.2d 1561 (11th Cir.1990).

Hobbs' death. In fact, Plaintiff's allegation against Defendant Brown for deprivation of psychological care is predicated solely on Defendant Brown's status as an elected official of the City of Daphne who in turn *generally* supervises the Chief of Police, Defendant Hall. Plaintiff has presented no evidence that could lead this Court to conclude that any specific act or action taken by Defendant Brown was causally connected to Hobbs' death. Thus, there being no proof in the record that a serious psychological need existed, Defendant Brown cannot have been deliberately indifferent to Hobbs' alleged serious psychological need.

Therefore, because Plaintiff has failed to demonstrate that Hobbs had a serious psychological need prior to his death, Plaintiff has failed to prove that there is a genuine issue of material fact for trial with regard to her claim that Hobbs was deprived of adequate psychological care while confined at the Daphne City Jail.

b. *Liability of the City of Daphne for the Inadequate Psychological Care of Hobbs*

■■■■ According to Plaintiff's complaint, the City of Daphne was deliberately indifferent to the psychological needs of Hobbs, and its indifference proximately caused his death. In *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the U.S. Supreme Court held that municipalities are subject to suits for damages under § 1983. However, the Court made clear that a municipality may not be held liable for a § 1983 violation unless the municipality has a policy or custom which caused the constitutional deprivation. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037. More importantly, a

municipality may not be held liable for a § 1983 violation under a respondeat superior theory of liability. *Id.* at 691, 98 S.Ct. at 2036. For § 1983 liability to attach to Plaintiff's inadequate psychological care claim pursuant to the Eighth Amendment's prohibition against cruel and unusual punishment, there must be a causal connection between the city's responsibilities and the injury suffered by the decedent. *See id.* at 690, 98 S.Ct. at 2035. Causation is met only if the municipal policy at issue is the moving force behind the constitutional violation. *See id.* at 694, 98 S.Ct. at 2037. In determining whether a city can be held liable under § 1983, "[a] court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'" *McMillian v. Monroe County,* 520 U.S. 781, ——, 117 S.Ct. 1734, 1736, 138 L.Ed.2d 1 (1997) (*quoting Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989)).

■■■■ Neither party to this litigation disputes that Police Chief Hall is the final policymaker for the Daphne City Jail. As such, Chief Hall is responsible for training, supervising and disciplining the jailers in the day-to-day operations of the jail. Therefore, for municipal liability to attach, the plaintiff must point to some policy, custom, or omission by Chief Hall that caused Hobbs' alleged serious psychological need to have not been met. Plaintiff must establish that Chief Hall, through his policies or customs, was deliberately indifferent to Hobbs' need.[63] The evidence must establish that there was a strong

---

63. The Court notes that Plaintiff has not alleged that a specific policy or custom of the City of Daphne or of Chief Hall as policymaker for the jail inflicted the constitutional injury of which she complains. Plaintiff maintains only that Hobbs was in need of psychological care from the moment he arrived to complete his sentence at the Daphne jail. Thus, the Court construes the allega-

tions in Count One of the Plaintiff's complaint to allege only that the relevant constitutional violation was the City's failure to treat the decedent's alleged mental illness and not it's failure to prevent his suicide, although at times, Plaintiff appears to advance both theories of liability. In either case the outcome of the analysis would be the same. *See Hardin,* 52 F.3d at 939 n. 7.

likelihood, rather than a mere possibility, that Hobbs would commit suicide if his needs were left unattended.

As previously outlined, Plaintiff has failed in this regard. Plaintiff has failed not only to establish that Hobbs had a serious psychological need, but that Defendants Hall and Brown were deliberately indifferent to such a need, if it existed. Plaintiff's decedent displayed no signs of psychological deficiencies which were obvious to Defendants. He had access to programs to help him cope with his alcohol addiction but failed to partake in them. He showed no signs of depression, mental illness, or despondency throughout his stay at the jail. On the contrary, Hobbs had earned status as a trustee within a month of his arrival, which allowed him to work in a city run animal shelter almost eight hours a day.

As for any alleged indifference to Hobbs' psychological needs on the day of his death, it is undisputed that his demeanor did not indicate that he was suicidal. Any suggestion by the Plaintiff that Defendants knew, or should have known, that Hobbs was a strong candidate for mental health treatment and a high risk for suicide is unsupported by the evidence. Thus, in the absence of a previous threat or attempt at suicide, this Court cannot conclude that "official conduct in failing to prevent a suicide constitutes deliberate indifference" to Plaintiff's decedent's alleged serious psychological needs. *Edwards,* 867 F.2d at 1275.

Furthermore, Plaintiff has not identified a custom or policy of the City of Daphne that failed to address her decedent's alleged serious psychological needs. Moreover, because this Court concludes that City personnel were not deliberately indifferent to Hobbs' mental health needs, "we need not consider whether any deficient City policy existed." *Hardin,* 52 F.3d at 939 n. 8; *see also Williams v. Lee County,* 78 F.3d 491, 493 (11th Cir.1996) ( [i]t was not necessary to "reach plaintiff's contention that Lee County is liable for the 'policies' of the sheriff because the plaintiff failed to produce evidence that any act or omission on the part of [sheriff] Chapman violated Williams' constitutional rights").

Moreover, vicarious liability will not support a § 1983 claim for deliberate indifference to Hobbs' alleged mental health needs; and even where a policy or custom of deprivation is specifically alleged, causation remains an essential element of the claim. Plaintiff has failed on Count One of her complaint to establish that Hobbs suffered from a serious mental illness of which the Defendants were aware, or that any Defendant was deliberately indifferent to Hobbs' needs. Thus, because Plaintiff has failed to demonstrate that Hobbs had a serious psychological need prior to his death, Plaintiff has failed to establish a genuine issue of material fact for trial with regard to her claim that Hobbs was deprived of adequate psychological care while confined at the jail. Therefore, Defendants' motion for summary judgment on Count One of Plaintiff's complaint is due to be, and is hereby GRANTED insofar as it pertains to Plaintiff's Eighth Amendment claim for deliberate indifference to Hobbs' psychological needs.

2. Count Two of Plaintiff's complaint alleges that Defendants' failure to implement and/or provide for any training or procedure regarding the handling of the mentally ill and/or suicidal inmates proximately caused the death of inmate Hobbs in violation of 42 U.S.C. § 1983.

a. *Failure to Train*

In Plaintiff's second claim against Defendants Hall and Brown, Plaintiff asserts that they were deliberately indifferent to Hobbs' constitutional right to health and safety because they failed to properly train their subordinates in the care of suicidal or intoxicated inmates. In the context of the facts of this case, such arguments have consistently been rejected by the Eleventh Circuit. To succeed on this claim, Plaintiff must prove that Defendants Hall and Brown knew that Hobbs faced a substantial risk of serious harm because of

inadequately trained personnel but disregarded that risk by failing to take reasonable measures to abate it. *See Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979. The legal foundation of this claim and the claim presented in Count One is deliberate indifference, and both claims intertwine in this respect. That being the case, Plaintiff's allegations in Count Two of her complaint must fail.

Plaintiff argues that Defendants failed to properly train their subordinates to recognize the potential of Hobbs to commit suicide given that he was "addicted to drugs and alcohol." In support of Plaintiff's claim, she alleges that Defendants were deliberately indifferent to Hobbs' safety because: (1) Defendant Hall failed to implement or provide "meaningful training" to the jailors, and by policy and custom, Hall failed to properly follow any procedure in the manuals available; (2) Defendant Hall's lack of proper screening created a dangerous environment in the jail for inmates addicted to drugs and alcohol; (3) Defendant Hall acquiesced and ratified the conduct of jailors Sledge and Rivero by failing to conduct an internal investigation after Hobbs' death; and (4) Defendant Brown does not know what the policies and procedures are at the jail. *See* Pl.'s Br. In Opp'n at 49–51. Plaintiff cites two cases to support her claim. One is a case from the D.C. Circuit, *Dorman v. District of Columbia,* 888 F.2d 159, 160 (D.C.Cir.1989); the other is a Sixth Circuit case, *Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir.1992). Neither case is apposite to the law of the Eleventh Circuit, nor do these cases satisfy Plaintiff's burden of demonstrating that Defendants' alleged failure to train jail personnel amounted to a violation of clearly established law. *See Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir.1994).

The undisputed facts of this case do not support Plaintiff's allegations. Defendants' unrebutted evidence demonstrates that jailors Sledge and Rivero completed an 80–hour correctional officers' training course that included instruction on suicide prevention and risk assessment. Officers were also instructed on suicide prevention in-house by Jailor Rivero. Additionally, training keys, which provided specific guidance on managing and dealing with potentially suicidal inmates, were distributed after the death of inmate Tony Smith in 1994. More importantly, in inmate Hobbs' case, Hobbs was moved to another cell, relieved of any objects with which he could harm himself, checked every fifteen to thirty minutes, and observed in a sleeping pose fifteen minutes prior to being found hanged. All of these precautions were taken after jailor Sledge found Hobbs' makeshift noose.

The law was clearly established on June 30, 1995. The cases in the Eleventh Circuit have been uniform in rejecting claims based upon "weakness in the screening process, the training of deputies and the supervision of prisoners." *Tittle,* 10 F.3d at 1540; *see Edwards,* 867 F.2d at 1277 (conduct by jail officials in leaving seemingly sleeping juvenile inmate, who had never threatened or attempted suicide and who had never been considered suicide risk, in secure cell for 45 minutes did not constitute deliberate indifference to inmate's safety from self-harm); *see also Hardin,* 52 F.3d at 938 (municipal liability unfounded where City personnel found not to have been deliberately indifferent to mental health needs of inmate who died from ingesting a bar of soap); *Popham v. City of Talladega,* 908 F.2d 1561, 1564–65 (11th Cir.1990) (claim that decedent fit profile of high suicide risk which screening would have detected is insufficient to establish deliberate indifference); *Heggs v. Grant,* 73 F.3d 317 (11th Cir.1996) (holding that, at the time of Heggs' suicide, the law did not require shift supervisor to do anything differently even though Heggs was intoxicated at time of her arrest, had previously been arrested for public drunkenness, denied ever having suicidal tendencies, but subsequently threatened to take her life and then retracted the threat as a joke); *Williams,* 78 F.3d at 493 (training and monitoring procedures for suicide prevention described in evidence disproved

deliberate indifference even though Sheriff's Department had information from probate court commitment order that inmate was mentally ill and posed a threat of substantial harm to himself and to others).

In *Heggs*, the Eleventh Circuit, in rejecting Plaintiff's failure to train claim, held that there was no evidence in the record to indicate that the jailors' assessment and evaluation of Heggs' potential for suicide on the night of her death was unreasonable. *See Heggs*, 73 F.3d at 321. The sequence of events leading to Heggs' suicide are factually similar to the case at hand. Heggs was arrested for public drunkenness and disorderly conduct. *See id.* at 318. Heggs was booked and asked a series of questions pertaining to her drug and alcohol history and past suicide attempts, if any. *Id.* Heggs admitted to being under the influence of alcohol but "denied having suicidal tendencies stating that she loved life and had never planned to kill herself in the past, nor would she in the future." *Id.* (internal quotations omitted). However, when advised that she would be placed in a cell, Heggs threatened suicide. *Id.* In accordance with standard operating procedure for the jail, the shift supervisor was called to evaluate the situation. *Id.* at 319. While waiting for the supervisor, Heggs retracted her statement, saying that "she was only joking about killing herself and . . . that she was just making it hard on [the jailor]." *Id.* When the supervisor arrived, Heggs was questioned about the seriousness of her threat, at which time she again disavowed an intent to take her life. *Id.* "In keeping with procedures affecting intoxicated inmates, the mattress, blanket and sheets were removed from Heggs' cell, but she continued to wear her street clothing." *Id.* On two occasions, during a time span of fifteen to thirty minutes before her death, Heggs spoke with the jailor. *Id.* Moreover, she was seen alive at least fifteen minutes prior to being found hung with her socks from the cell bars. *Id.*

Applying the law of the Circuit, the Court in *Heggs* concluded that "although Heggs threatened to kill herself, she quickly and emphatically recanted the threat." *Id.* at 321. The Court noted that Heggs was checked every fifteen minutes despite her recantations and found that the jailor was reasonable in believing that Heggs would not commit suicide. *Id.* The Court held that "no clearly established law required [the Chief of Police] to staff the jail or train his officers more thoroughly under these circumstances." *Id.*

Likewise, in the case at hand, although a noose was found in Hobbs' cell, he disavowed any serious intention to kill himself. In fact, when pressed by jailor Sledge to explain why he made the noose, Hobbs told jailor Sledge that "the noose 'didn't mean nothing,' and that he was just bored." Sledge Aff. ¶ 7. Nonetheless, despite Hobbs' recantation, he was checked every fifteen to thirty minutes. He was seen alive fifteen minutes prior to being found hanged. He spoke to jailors Sledge and Rivero on at least three separate occasions prior to committing suicide and on each occasion, both Rivero and Sledge made independent assessments as to Hobbs' demeanor. Both determined that Hobbs was calm, displayed no despondent or suicidal tendencies, was not withdrawn, delusional or depressed. Hobbs requested and was given cups of coffee. By all accounts, prior to his death on June 30, 1995, Hobbs was known to be "jolly and friendly." Hall Aff. ¶ 6. Neither the jailors on duty the night of Hobbs' suicide, nor any of the Defendants to this action, had any reason to believe that Hobbs was potentially suicidal. As with the decedent in *Heggs*, "[t]here is nothing in the record to demonstrate that [jailors Sledge and Rivero's] evaluation of the situation was unreasonable . . . [and] no clearly established law required [Defendants here] to staff the jail or train [their] officers more thoroughly under these circumstances." *Heggs*, 73 F.3d at 321. Like the Court in *Heggs*, this Court concludes that "there was no . . . legal duty imposed at the time of [Hobbs'] suicide requiring the custodial authorities to do more than what was done on this occasion." *Id.*

Furthermore, as supervisory officials of the City of Daphne, Defendants Hall and Brown cannot be held "liable under section 1983 for an injury resulting from [their] failure to train subordinates unless [their] 'failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact' and the failure has actually caused the injury of which the plaintiff complains." *Belcher*, 30 F.3d at 1397 (*quoting Popham*, 908 F.2d at 1564–65). The evidence in the record sufficiently establishes that there was no constitutional deprivation as such on the part of Defendants Hall and Brown.

Plaintiff has offered no substantial proof that either Hall or Brown in their individual capacities as Chief of Police and Mayor, respectively, of the City of Daphne were causally connected to Hobbs' suicide. There is no evidence that Mayor Brown even knew of Hobbs' incarceration in the city jail. On the contrary, Plaintiff has adduced no evidence to contradict Mayor Brown's testimony that he was unaware of Hobbs' very existence until the day after his suicide, when he received notice from Chief Hall. There is also no evidence that Chief Hall had any knowledge that there was a "strong likelihood" that Hobbs would commit suicide. Plaintiff's reliance on the fact that her decedent allegedly had an addiction to alcohol and was intoxicated on the day of his death is insufficient, in and of itself, to meet the "strong likelihood" threshold. *See Popham*, 742 F.Supp. at 1508 (following the Eleventh Circuit's holding in *Edwards*, and finding that, even though the decedent in the case was intoxicated the day he entered the city jail, in the absence of a previous threat or attempt at suicide, the failure to prevent a

prisoner's suicide did not constitute deliberate indifference), *aff'd by* 908 F.2d 1561 (11th Cir.1990).

Furthermore, despite the negative light Plaintiff would like to cast on the City's [64] and Defendants Hall's and Brown's training and supervision of their subordinates, the unrebutted evidence establishes that suicide prevention was covered by both an 80–hour correctional officer's course that the jailors were required to attend at one of the local colleges, and by an in-house training program. Additionally, procedures were in place for providing inmates access to alcohol treatment programs and evaluating them for mental health problems, including potential suicide. The training and monitoring procedures established by the evidence before the Court tend to disprove deliberate indifference, and shift to the plaintiff the burden of producing some evidence in that regard.[65] *See Williams*, 78 F.3d at 493 ("[w]e have found less formal means of suicide prevention that those of Lee County to pass constitutional muster.") (citations omitted).

Consequently, the Court concludes that Plaintiff has failed to meet her burden and that there is no official policy, custom, or lack of training, etc., to support a claim against the City. Therefore, the Defendants are entitled to summary judgment on the Plaintiff's constitutional claims on that basis alone. However, the Court will address the other issues raised, below.

b. *Qualified Immunity*

 Defendants Hall and Brown have asserted a defense of qualified immunity with regard to Plaintiff's claims.

**64.** As previously discussed, the Court need not reach Plaintiff's contention that the City of Daphne is liable for the policies and procedures established by Chief Hall to treat mentally ill inmates or those prone to suicide because, as a matter of law, Plaintiff failed to produce evidence that any act or omission on the part of Defendants Hall or Brown violated Hobbs' constitutional rights. *See Williams*, 78 F.3d at 493.

**65.** While the Plaintiff has attempted to substantiate deliberate indifference by providing "hindsight" expert testimony concerning steps that could have been taken to prevent Hobbs' suicide, and highlighting deficiencies in the training of the Defendants' subordinates in recognizing "pre-disposing factors" of potential suicide, "these alleged weaknesses, without more, do not amount to a showing of deliberate indifference...." *Williams*, 78 F.3d at 493 (*quoting Tittle*, 10 F.3d at 1540).

Qualified immunity requires that Defendants first demonstrate that they were public officials acting within the scope of their discretionary authority. *See Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir. 1988). The Supreme Court has defined discretionary actions as those actions that are "influenced by the decisionmaker's experiences, values, and emotions." *Harlow v. Fitzgerald,* 457 U.S. 800, 816, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). The Eleventh Circuit has held that qualified immunity is available to a government official—even if his actions appear to be ministerial in nature—so long as the official's actions " '(1) were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.' " *Jordan,* 38 F.3d at 1566 (*quoting Rich,* 841 F.2d at 1564 (11th Cir.1988)). Accordingly, if the conduct at issue falls within this definition, then it is established that the official was acting within the scope of his discretionary authority. *See McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995). The availability of qualified immunity is a question of law and when properly invoked protects government actors in their individual capacities from federal civil damage claims. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *see also Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816–17, 86 L.Ed.2d 411 (1985).

■ Applying the principles outlined in *Jordan,* the record in this case clearly establishes that both Mayor Brown and Chief Hall were acting within the scope of their discretionary authority in relation to Hobbs. Their action or inaction in response to the mental health care needs of Hobbs and other Daphne City Jail inmates was carried out in the performance of their duties and was within the scope of their authority. Thus, the burden then shifts to the Plaintiff to demonstrate that a reasonable government actor would have known that his conduct violated a clearly established constitutional right. *See McCoy,* 47 F.3d at 407. The "clearly established" standard is "fact specific," *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994), so the Plaintiff must point to a controlling case of the "United States Supreme Court, the applicable circuit of the United States Court of Appeals, and the highest court of the respective state," *Vinson,* 10 F.Supp.2d at 1297 (*citing D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir.1995); *Courson v. McMillian,* 939 F.2d 1479, 1498 n. 32 (11th Cir.1991)), decided before the events at issue, which establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994).[66] Furthermore, this Court will not infer the law from generalized sweeping language in opinions, the "[l]aw is clearly established by holdings...." *Belcher,* 30 F.3d at 1400.

In attempting to satisfy her burden of overcoming the Defendants' qualified immunity defense, the Plaintiff cites two cases to support her proposition that the Defendants' reckless disregard of Hobbs' constitutional rights cannot shield them from liability. The first case cited is *Rivas v. Freeman,* 940 F.2d 1491 (11th Cir. 1991).[67] While *Rivas* does state that a failure to train can rise to the level of a constitutional violation sufficient to defeat qualified immunity, Plaintiff completely misstates its application to the case at hand. The holding in *Rivas* is narrowly limited to the facts presented by a pretrial detainee who alleged and proved deliberate indifference to his constitutional rights where the sheriff's policies and procedures regarding techniques for identifying suspects and for accounting for incarcerated suspects were found to deprive the detainee of his liberty interests. Thus, only after establishing deliberate indifference on the part of the defendant sheriff

---

**66.** As *Lassiter* emphasized, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what [he] is doing

violates federal law in the circumstances." 28 F.3d at 1150 (emphasis omitted).

**67.** The Court notes that Plaintiff failed to provide a citation for this case.

was the *Rivas* plaintiff allowed to pierce the cloak of qualified immunity. By contrast, the Plaintiff here has failed in that regard. There has been no substantial proof of deliberate indifference on the part of any Defendant to this litigation. Moreover, the case before the Court is narrowly focused on jail suicide and the law pertaining to such does not turn on mistaken identity as was the case in *Rivas*. *Rivas* is inapposite to the case at hand. Plaintiff instead must prove that the law, at the time of her decedent's death, clearly established that a government official is deliberately indifferent when he fails to train his subordinates in the handling of suicidal inmates. *See Belcher,* 30 F.3d at 1397–98. Plaintiff has not met her burden and the law has not changed since the *Belcher* decision.

The other case cited by the Plaintiff, *Hall v. Ryan,* 957 F.2d 402, 404 (7th Cir. 1992), is a Seventh Circuit case that holds no weight in this circuit. Furthermore, the case is substantively inapposite to the facts of the present case.

Based on the foregoing, the Court finds that the Defendants' motion for summary judgment is due to be, and is hereby GRANTED as it relates to the Plaintiff's § 1983 claims against the Defendants for failure to train.

3. Count Four of Plaintiff's complaint alleges a violation of Hobbs' constitutional rights under the Fifth, Eighth and Fourteenth Amendments to the Constitution pursuant to 42 U.S.C. §§ 1985 and 1986, and Ala.Code § 6–5–410.

Plaintiff alleges, *inter alia,* that the Defendants deprived Hobbs of his rights secured under the Fifth, Eighth and Fourteenth Amendments of the Constitution of the United States in violation of the provisions of 42 U.S.C. §§ 1983, 1985 and 1986, and that Defendants' breached a non-delegable duty in violation of Alabama Code § 6–5–410.[68] In her Brief in Opposition to

Defendants' Motion for Summary Judgment, Plaintiff attempts to clarify this claim by briefly arguing that the claim is "merely a reiteration of the above [previous claims] with the additional allegation that the Defendants combined and concurred in their wrongful acts to cause the death of Scott Hobbs." Pl.'s Br. in Opp'n. at 52. However, Plaintiff does not otherwise state a claim under §§ 1985 or 1986 by alleging that the Defendants conspired to interfere with the decedent's civil rights. In their brief in support of their motion for summary judgment, the Defendants aptly argue that proof of a conspiracy requires that "you must have two persons or entities to have a conspiracy," *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir.1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953), and to prove that a conspiracy exists, "a plaintiff 'must show that the parties reached an understanding to deny the plaintiff['s] [decedent] his rights [and] prove an actionable wrong to support the conspiracy.'" *Bailey v. Board of County Comm'rs,* 956 F.2d 1112, 1122 (11th Cir.1992) (*citing Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990), *cert. denied,* 500 U.S. 932, 111 S.Ct. 2053, 114 L.Ed.2d 459 (1991)). Plaintiff has failed to respond to the Defendants' arguments with respect to her §§ 1985 and 1986 claims, except to say that they are "merely a reiteration of the above [claims]." There being no evidence in the record or law cited to support the Plaintiff's allegations, as a matter of law, summary judgment is due to be, and is hereby GRANTED in favor of the Defendants on the Plaintiff's claims under 42 U.S.C. §§ 1985 and 1986.

**B.** *Plaintiff's State Law Claim for Wrongful Death*

Count Three of the Plaintiff's complaint alleges a state law claim for wrongful death pursuant to Alabama Code § 6–5–410. Federal jurisdiction over supplemen-

---

**68.** The Court notes that Plaintiff has not indicated or briefed the Court in any way on what particular "non-delegable duty" under § 6–5–410 the Defendants are accused of breaching

or how in fact a duty was breached. That being the case, the Court assumes that the Plaintiff has abandoned this claim.

tal state law claims is governed by 28 U.S.C. § 1367(a), which provides that,

> in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

However, "the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Therefore, this Court having dismissed all of the federal claims that gave it original jurisdiction, hereby declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

## V. CONCLUSION

Based upon the foregoing, the Defendants are entitled to summary judgment on all of the Plaintiff's federal claims. The Court declines supplemental jurisdiction of the remaining claim for wrongful death under state law in light of the insubstantial nature of the federal claims. That claim is, therefore, dismissed without prejudice for refiling same in state court. *See* 28 U.S.C. § 1367(d).